## PAN AMERICAN PETROLEUM AND TRANSPORT COMPANY ET AL. v. UNITED STATES.

CERTIORARI TO THE CIRCUIT COURT OF APPEALS FOR THE NINTH CIRCUIT.

No. 305. Argued October 4, 5, 1926.—Decided February 28, 1927.

1. The evidence sustains findings that the making of the leases and contracts involved herein was dominated by the Secretary of the Interior, acting collusively with the representative of the two defendant oil companies; that the Secretary of the Navy took no active part in the negotiations; and that the leases and contracts were procured by corruption and fraud. P. 498.
2. The finding that the Secretary of the Navy signed the documents under misapprehension and without full knowledge of their contents is not sustained. An opposite finding is required by the record. P. 498.
3. In a suit by the United States to annul contracts made through its officials with private corporations, the *bona fides* of which had been investigated by a committee of the Senate, statements made to the committee by the companies' representative, who voluntarily appeared in defense of their interests, showing that he gave money to one of the officials who dominated the procurement and participated in the execution of the contracts, were admissible against the defendant corporations in proof of fraud. P. 498.

   *So held* where he who made the statements was the representative of both companies in procuring the contracts; was at that time president of one company and chairman of the board of directors of the other, having been its president also; controlled both companies through stock ownership; and was chairman of both boards of directors when he testified.

4. A lease of the land of a naval reserve and related contracts, which were procured by private corporations as the result of collusion and corrupt conspiracy between their representative and a high government official who, under an executive order, dominated the administration of the reserve, may be avoided by the United States without regard to whether money paid the official by the representative constituted bribery as defined in the Criminal Code, or whether the official was financially interested in the transaction, or the United States suffered or was liable to suffer any financial loss or disadvantage as a result of the contracts and leases. It is enough if the official's interest and dominating influence were corruptly obtained. It was shown that he so favored the lease and contracts that he could not loyally serve the interests of the United States. P. 500.

5. The Secretary of the Navy was not empowered by the Appropriation Act of June 4, 1920, to enter into contracts involving the leasing of all the unleased land of a naval petroleum reserve, and providing for the use of the crude oil, to be derived by the United States as royalties under such leases, for the acquisition of extensive storage facilities filled with fuel oil for the Navy. Pp. 501, 502, 508.

6. Under the proviso of the Naval Appropriation Act of June 4, 1920, the authority of the Secretary of the Navy to provide facilities in which to "store" naval reserve petroleum or its products did not extend beyond those that might be provided by use of the money made available by that act. P. 509.

7. While the general principles of equity are applicable in a suit by the United States to secure the cancelation of a conveyance or the rescission of a contract, they will not be applied to frustrate the purpose of its laws or to thwart public policy. P. 505.

8. In this suit brought by the United States to set aside illegal and fraudulent leases and contracts, which were made for the purpose of circumventing its laws and defeating its policy for the conservation of its naval petroleum reserves, the United States does not stand on the footing of an individual suing to annul a deed for fraud; its position is not that of a mere seller or lessor of land; the purpose is to vindicate the policy mentioned, the financial element being secondary; the defendants are wrong-doers, and have no equity to reimbursement for their expenditures as a condition to the granting of the relief sought by the Government. Pp. 503, 508.

9. In a suit by the United States to set aside for illegality and fraud leases made, in contravention of the policy of conserving naval petroleum reserves, and contracts made, as part of the same transaction, for erection of oil storage facilities for the Navy, not authorized by Congress, on land of the United States and for storing them with fuel oil, equity does not exact as a condition to the relief prayed that the defendants be compensated for the cost to them, or the value to the Government, of the construction work performed or fuel oil furnished under the contracts, or for the amount they expended in drilling or operating oil wells or in other improvements on the leased premises; but their compensation, if any, must depend on Congress. Pp. 503, 508.

9 F. (2d) 761, affirmed.

CERTIORARI (270 U. S. 640) to a decree of the Circuit Court of Appeals which affirmed in part and in part reversed a decree of the District Court (6 F. (2d) 43), in a suit by the United States to cancel two leases of land in a naval petroleum reserve, and two contracts for erecting storage facilities and supplying fuel oil for the Navy. The bill also prayed an account. The decree of the District Court canceled the leases and contracts for fraud and illegality, but, in the accounting, allowed credits to the two corporations for their expenditures under the leases and contracts, with interest. The Circuit Court of Appeals denied such credits, but in other respects affirmed the decree.

*Messrs. Frank J. Hogan* and *Frederic R. Kellogg,* with whom *Messrs. Joseph J. Cotter, Dean Emery, Harold Walker, Charles Wellborn, Olin Wellborn, Jr., Henry W. O'Melveny,* and *Walter K. Tuller* were on the brief, for petitioners.

Under the Act of June 4, 1920, the Secretary of the Navy had authority to make the exchange contracts and the leases. This was a special enactment, complete in itself, relating to a subject which was not included in the general leasing act, and simply placed in the form of a proviso for legislative convenience, or for some other reason which does not affect its meaning and scope. *Amer. Express Co.* v. *United States,* 212 U. S. 522; *I. C. C.* v. *Baird,* 194 U. S. 25; *C. & P. Tel. Co.* v. *Manning,* 186 U. S. 238. The Act contains within itself a complete and comprehensive legislative scheme to repose exclusive control in the Secretary of the Navy as to all matters in connection with naval reserve affairs. The entire responsibility for the handling of these naval reserves was vested in him, and he was given full discretion.

He could theoretically leave them as they were and take chances with regard both to the loss of oil from adjacent drilling and as to the unavailability of petroleum products for naval use when needed. This is covered by the use of the word " conserve " in its narrow sense. This was not what Congress had primarily in mind, because it could have been accomplished without any new legislation; and the law had been passed with the idea that active and not inactive methods should be thereafter pursued in order to protect both the oil reserves and the strategic interests of the United States Navy. The word " conserve " must be construed together with the other language used—and is immediately followed by the words " develop, use and operate." Hence, it is submitted to be clear that an active conservation and not merely a passive conservation was intended by Congress, and that Congress recognized that truest conservation of oil which was intended for the use of the Navy might well be accomplished by operating and developing the oil fields— using them—getting the oil to the surface either by lease, development, contract—or otherwise taking such steps

that this oil should be transmuted into something which the Navy could actually consume, and so locating it that when necessary it would be available for naval service.

The word "develop" can have but one meaning as applied to oil territory, and that is to cause oil to be produced from that territory. The Secretary could do this directly by hiring drillers and organizing a field force, if he saw fit, which would be an "operation" of the property. Or he could develop the same property indirectly or by contract—that is to say, by hiring the services of skilled oil men to do the necessary work and produce all oil possible, for the account and risk of the United States. Or he could "lease" all or any part of this property. To emphasize the extent of his discretion as to how these lands should be handled, the words "or otherwise" are added after the specific words hereinbefore mentioned.

As to the leasing power, it is absolutely unlimited and unconditional. There is no limit as to the area which could be leased in any or all of the reserves. In this respect the statute is notably different from certain of the sections of the law of February 25, 1920, in which definite limitations were placed upon the power of the Secretary of the Interior to lease lands. The contrast between these two laws is so clear that it is inconceivable that Congress intended to hamper the Secretary of the Navy with any such limitations as to areas as those by which the Secretary of the Interior was bound under portions of the prior statute. Nor is the Secretary of the Navy limited as to the time for which any lease might be made.

There is no limitation as to the terms and conditions, as to royalty or otherwise, which may be introduced in any lease made by the Secretary of the Navy. Here again this law differs notably from certain provisions of the Leasing Act. There is no limitation as to the purpose for which leases shall be made, except that they

must be, in the discretion of the Secretary of the Navy, "for the benefit of the United States." There is no condition fixing any particular set of circumstances or motives or reasons which must exist in order to give the Secretary of the Navy power to make any such lease.

On behalf of the plaintiff it is urged that the power given the Secretary of the Navy to "conserve, develop, use and operate" the lands in the naval petroleum reserves "in his discretion, directly or by contract, lease or otherwise," is limited by an implied condition that such development and operation could only be undertaken if drainage from outside sources was threatened. We submit that to so hold would be to write into the law a limitation and condition which it does not contain, and which if thus written in would absolutely prevent the taking out of oil from the land at times when, even if no drainage danger existed, the oil was needed either for the present or the future operations of the Navy.

Plaintiff's counsel further contend that the law did not give the Secretary of the Navy any power to establish, above ground, reserves of petroleum products, but only permitted him, if and when he had any available oil, to "use the oil for current use or exchange it for current use oil." Any such attempted limitation is inconsistent with the reserve idea for national defense embodied in the designation "Naval Reserves." Any such limitation would at once strike down one of the important strategical and practical purposes for which these reserves were to be created, i. e., to create something which would not merely theoretically, but practically, be available for the uses of the Navy at such time as its exigencies might require. As a practical matter, if this construction were adopted, where would the line be drawn?

The Secretary had the right to lease if he believed that the development of the property and the taking of the oil by means of a lease, would operate to the best in-

terests of the Navy, either by the establishment of an above-ground reserve of fuel oil, into which the crude might be exchanged, or otherwise. His discretion will not be reviewed by the courts. *Ness* v. *Fisher,* 223 U. S. 683.

The power to exchange: The word " exchange " is clearly the most important word in this branch of the statute, so far as the practical operation of the statute for the benefit of the Navy itself is concerned. For, remembering that under the former law royalty oils must always be sold, but that this would immediately make the operation of the naval reserves a commercial proposition, rather than a Navy fuel proposition, obviously the only · way in which any royalty oils could be turned to account for naval benefit under the terms of the Act was by the exercise of the power to exchange them for other things.

The Act as originally drawn contained the word " refine " so as to give the Secretary power to " use, refine," etc., but in its final form as adopted the word " refine " was stricken out. This left, as the sole and only mode by which royalty oils could be turned to account for naval purposes, the exercise of the exchange power. The well recognized meaning of " exchange " contains no limitation whatsoever as to the character or quality of the things which may be the subject of the exchange, or the terms or conditions of the contract. The only requisite is that the subject matter must be property other than money. *Postal Tel. Co.* v. *R. R. Co.,* 248 U. S. 471; *B. & O. R. R.* v. *Western Union,* 241 Fed. 170; 23 Cor. Jur. 186–7; Words and Phrases, 1st series, p. 2546. There is no logical basis for limiting the exchange practice to current fuel oil or to facilities for the storage of royalty. oils only.

The court holds that the Secretary may exchange royalty oil for fuel oil, but qualifies this by insisting that

he must intend this fuel oil for current use.  And the court also holds that the Secretary had power to exchange royalty oil for storage facilities, but again qualifies this by saying that these storage facilities must be intended "for the storage of royalty oils."  We submit that distinctions of this nature have no basis in the law or in logic.  There is but one logical limitation of the exchange power contained in these general words, and that is that it must be exercised in the discretion of the Secretary for some purpose not merely relating to the Navy Department as an entirety, but related to the Naval Reserve, petroleum and petroleum products problems of the Navy Department.

The power to store: The power to acquire storage facilities as well as petroleum products through the exercise of the exchange power is directly within the many cases holding that, where a particular power is granted, everything necessary to carry out the power and make it effective and complete will be implied from the language of the statute.  *Tel. Co.* v. *Eyser,* 19 Wall. 427; *Wilson* v. *Bank,* 103 U. S. 778; *Dooley* v. *Railroad,* 250 Fed. 143: *Ex parte Yarbrough,* 110 U. S. 658; and other cases. To deny that this power was granted by the express use of the word "store," as well as by the necessary and proper interpretation of the word "exchange" as an incidental thereto, would be to limit the exchange power to cases and places where containers already exist—a construction which, in view of the comprehensive plan to administer the Naval Reserves and to supply the needs of the Navy as to fuel and other petroleum products, would simply defeat and not effectuate the clear intent of Congress.

The idea of an available fuel reserve was one of the ideas which led to the passage of the statute.  The question of the proper interpretation of the statute cannot be affected by the amount of royalty oil which the Secretary may determine to exchange for fuel oil and its containers.

The appropriation clause does not limit the power of the Secretary of the Navy under the Act, except in the expenditure of cash. This appropriation was not intended as a limitation upon any power, but solely as an aid to the execution of such powers as might require the use of cash. Even under the Circuit Court of Appeals' interpretation of this clause, the $500,000 cannot be the final limit, because in a proper case it could be renewed and re-renewed under the last clause of the statute by being reimbursed out of any other " proper appropriations." The clause refers to the " use " of royalty oil for fuel and the use of a part of some fuel appropriation to reimburse the $500,000 appropriation if some part has been spent. The draftsman of the clause doubtless had in mind the possibility that the Secretary might himself refine some of the royalty oil and use for current consumption a part of the products therefrom, in which case he would be saving the Government a part of the cash appropriation which otherwise would be called upon to furnish fuel for the Navy.

The contracts of April 25 and December 11, 1922, were intended to be and were exchange contracts within the meaning of the law. This is true despite the provisions thereof by which the quantities of crude oil and fuel oil to be delivered were made variable in cases of variance of the reference prices of these two commodities. *Postal Tel. Co.* v. *Tonopah R. R. Co.,* 248 U. S. 471; *B. & O. R. R.* v. *Western Union Tel. Co.,* 241 Fed. 162; *id.,* 242 Fed. 914; *Chicago R. R. Co.* v. *Postal Tel. Co.,* 245 Fed. 592. If the Court should hold that this transaction presented any of the elements of a sale, then the plaintiff is no nearer success; for the reason that the plaintiff would have also proved that such a sale, even though the price is payable in property or rights, was likewise within the power of the Secretary to make. The statute as to

payment of cash into the Treasury applies only if there is cash.

The power to lease naval reserve lands, conferred by the Act of June 4, 1920, supports the contracts as well as the leases in suit. The Secretary could have agreed that the consideration to the Government under any lease should be fuel oil, a refined product of crude oil, rather than the oil in its crude state at the time of original production; and that as part of the consideration from the lessee to the Government the former should provide storage tanks or other necessary improvements on the reserves. There was nothing in the law to prevent the Secretary from making the lease of December 11th upon consideration of a percentage of crude oil produced from the leased lands by the lessee, and a specified quantity of fuel oil and other pertroleum products in storage. In his judgment, exercising the discretion committed to him by law, it was "for the benefit of the United States" to lease, upon the above mentioned considerations, the lands in Naval Reserve No. 1. That judgment is unreviewable. *Ness* v. *Fisher*, 223 U. S. 683.

The contracts of April 25 and December 11, 1922, are not void because providing for the establishment of a new naval fuel depot without express authority from Congress. They only provided for an enlargement of an existing fuel depot and not the establishment of a new one. It was nothing more than an amplification of a previously established fuel depot. The Act of June 4, 1920, gave the Secretary absolute power to provide for the construction of such storage tanks as he might see fit, whether these were constructed in connection with the depot already established or at a new depot. If these new tanks could not have been constructed without the prior express approval of Congress, then the Secretary could not have used any of the $500,000 general appropriation contained in the Act for the construction of a storage

tank at any place whatsoever unless Congress had passed a subsequent act. approving the particular location for the tank.

The contracts were not invalidated by reason of any lack of public advertisement. Neither § 3709 Rev. Stats., nor any other general law of the United States provides that competitive bidding or public advertisement should take place in cases of acquisition of property through exchange contracts. There are no general statutes requiring public advertisements as to sales. None of the statutes has anything to do with exchanges, which are covered by entirely different rules, and which would not usually be the subject of competitive bidding. In the absence of express statutory requirement, no competitive bidding is necessary in connection with governmental contracts. *Price* v. *Fargo* 24 N. D. 440; *Crowder* v. *Sullivan,* 128 Ind. 486. The Act of June 4, 1920, vested in the Secretary ample discretion to enter into contracts pursuant to such methods as seemed to him best. This special statute contains the only measure of his authority, and general enactments contained in prior laws have no bearing in such case. *Fowler* v. *United States,* 3 Ct. Cls. 43; *In re Snow & Ice Transp. Co.,* 22 Op. Atty. Gen. 437; *In re Claim of Leach,* 9 Comp. Dec. 457; *Pacific Whaling Co.* v. *United States,* 36 Ct. Cls. 105; *In re Claim of Iowa,* 9 Comp. Dec. 656; *United States* v. *Matthews,* 173 U. S. 381; *State* v. *Stoll,* 17 Wall. 425; *Walla Walla* v. *Walla Walla Water Co.,* 172 U. S. 1; *New York C. & H. R. R.* v. *United States,* 21 Ct. Cls. 368; *Cobb* v. *United States,* 7 Ct. Cls. 470; *Townsend* v. *Little,* 109 U. S. 504; *French* v. *Spencer,* 21 How. 237; *Kepner* v. *United States,* 195 U. S. 125; *Rodgers* v. *United States,* 185 U. S. 87; *Hemmer* v. *United States,* 204 Fed. 906; *Jackson* v. *Graves,* 238 Fed. 117; *United States* v. *Chase,* 135 U. S. 255; *Priddy* v. *Thompson,* 204 Fed. 955; *Anchor Oil Co.*

v. *Gray,* 257 Fed. 283; *Magone* v. *King,* 51 Fed. 525.   If Congress had intended to limit the inclusive provisions of the Act, it would have so provided in the law itself.

The Secretary was not required to resort to competitive bidding as a condition precedent to the making of the leases of June 5 and December 11, 1922.   *Teapot Dome Lease Case,* 5 F. (2d) 330; *United States* v. *Belridge Oil Co.,* D. C. S. D. Cal., July 17, 1925, unreported; affirmed, 13 F. (2d) 562; Shealey, Law of Government Contracts, p. 159.

The Secretary of the Navy, in connection with the contracts and leases involved, exercised the power conferred upon him by the Act of June 4, 1920.

The District Court found that the Secretary of the Navy did not in fact really make the contracts which in law he was authorized to make.   The Circuit Court of Appeals did not approve or even discuss this finding of fact.   Assuming the legal power of the Secretary of the Navy, then if he in fact exercised it, the instruments here in suit are unassailable.   There was no claim in the courts below and there can be none here, that he was party to any conspiracy, to the commission of any fraud, that he was bribed or that on the subject of these contracts there was any misrepresentation made to him, any deceit practiced upon him, or any improper influence exerted over him, by Secretary Fall, on the one hand, or by any person connected with these defendants, on the other.   The record is bare of any representations of any kind made by Secretary Fall to Secretary Denby in connection with the making of these contracts.   And this statement is true as regards any and every officer of the Navy Department who had any connection with, or performed any duty in relation to, these contracts or the departmental plans, decisions, or negotiations which brought about their making.

One who signs a document is presumed to have knowledge of its contents. There is always a presumption that official acts or duties have been properly performed. *Ross* v. *Stewart,* 227 U. S. 530; *Cincinnati Ry.* v. *Rankin,* 241 U. S. 319; *Delassus* v. *United States,* 9 Pet. 117; *Phila. & T. R. Co.* v. *Stimpson,* 14 Pet. 448; *Bank of U. S.* v. *Dandridge,* 12 Wheat. 65; *Quinlan* v. *Green Co.,* 205 U. S. 410. The evidence shows that so far as the matters in issue are concerned the Secretary of the Navy exercised the powers and discretion conferred upon him by Congress, and that the Executive Order, except for the purpose of enlisting the aid of Interior Department officials, became immaterial. See *Bostwick* v. *United States,* 94 U. S. 53; *Harker* v. *Harvey,* 181 U. S. 481; *Cook* v. *United States,* 91 U. S. 389. The Navy Department had in the person of Robison, acting always under the immediate direction and supervision of Secretary Denby, complete domination, direction and control of leases and contracts in respect of the naval reserves.

Secretary Fall did not make, or dominate the making of, the contracts and leases in suit.

The contracts were not invalid because of any illegal delegation to the Secretary of the Interior of discretionary powers which could only be exercised by the Secretary of the Navy. The discretion which cannot be delegated is the discretion which involves the exercise of original power as to whether or not a public enterprise shall be undertaken. Such element of discretion as is involved in the performance of merely executive and business acts does not go to the essence of the matter and is not within any such prohibition. *Cass County* v. *Gibson,* 107 Fed. 363; *Klamroth* v. *Albany,* 127 N. Y. 575; *Hitchcock* v. *Galveston,* 96 U. S. 341. The meaning of the words " ministerial " and " administrative " cannot be construed as excluding all judgment and discretion.

An executory contract containing a void clause—unauthorized and *ultra vires*—may be modified by the parties so that the clause is no longer operative. The rights of the defendants under the leases do not depend upon whether the Secretary of the Interior could be delegated as the agent to carry out the intent of the preferential right clauses, which were not essential parts of the contracts. A contract is not affected by a clause which, although void in itself, is of such a nature that it does not appear that the contract would not have been made without it. *United States* v. *Bradley,* 10 Pet. 343; *Navigation Co.* v. *Windsor,* 20 Wall. 70; *Gelpcke* v. *Dubuque,* 1 Wall. 222; *United States* v. *Hodson,* 10 Wall. 408; *Reagan* v. *Trust Co.,* 154 U. S. 395; *Topliff* v. *Topliff,* 122 U. S. 121; *McCullough* v. *Smith,* 243 Fed. 823; *Trustees* v. *Spitzer,* 255 Fed. 126; *In re Johnson,* 224 Fed. 185. See also *Burke* v. *Southern Pac. Co.,* 234 U. S. 669. An authorized officer may ratify contracts made, or containing clauses that are *ultra vires. Gas Co.* v. *Dunn,* 62 Cal. 580; *Hitchcock* v. *Galveston, supra.* Contracts void in part are not wholly void, *Gas Co.* v. *Dunn, supra,* and in this respect there is no difference between the rule applicable to contracts and to statutes. *Albany Co.* v. *Stanley,* 105 U. S. 305; *Baldwin* v. *Franks,* 120 U. S. 678; *Field* v. *Clark,* 143 U. S. 649; *Poindexter* v. *Greenhow,* 114 U. S. 270.

There is no merit in the contention that there must have been a conspiracy because of the " secrecy " in connection with the transactions here involved.

The loan of $100,000 by Mr. Doheny to Mr. Fall in no way affected the transactions; it was a *bona fide* loan and not a bribe; and it was not proved by any evidence competent and admissible against the defendants.

The voluntary statement made by Mr. Doheny in 1924 was no part of the *res gestae* of the litigated acts. *Vicks-*

*burg R. R. Co.* v. *O'Brien,* 119 U. S. 99; *Goetz* v. *Bank,* 119 U. S. 551; *Packet Co.* v. *Clough,* 20 Wall. 528; Jones on Evidence, § 344. The declarant was no longer president of the companies and declarations made after he ceased to hold that office are not admissible against the companies. *Walker Mfg. Co.* v. *Knox,* 136 Fed. 334; *Kenah* v. *Markee,* 3 Fed. 45; *Woolsey* v. *Haynes,* 165 Fed. 391; *Hudson Co.* v. *Higgins,* 85 N. J. L. 268. There is no implied authority for a director or chairman of a board of directors to make statements binding a corporation, except when acting as a board. *Farmers Co.* v. *Thrasher,* 144 Ga. 598; *Allington Co.* v. *Reduction Co.,* 133 Mich. 437; *Kalamazoo Co.* v. *McAlester,* 36 Mich. 326; *Soper* v. *Buffalo R. R. Co.,* 19 Barb. 310; *Peek* v. *Novelty Works,* 29 Mich. 313; *Niagara Bridge Co.* v. *Bachman,* 66 N. Y. 61; Cook, Corporations, vol. 4, § 726; Breen's Brice's Ultra Vires, p. 503. A majority stockholder as such cannot by his statements bind a corporate entity. Statements made by a " witness " while testifying are not admissible in any subsequent proceedings against the corporation of which he is an officer or agent. *Vohs* v. *Shorthill,* 124 Iowa 476; *Columbia Bank* v. *Rice,* 48 Neb. 431; *Estey* v. *Birnbaum,* 9 S. D. 176; *Salley* v. *R. R. Co.,* 62 S. C. 128; *Louisa Bank* v. *Burr,* 198 Ia. 4; *Bangs Co.* v. *Burns,* 152 Mo. 350; *Byrne* v. *Hafner Co.,* 143 Mo. App. 85; *Rush* v. *Burns,* 152 Mo. 660; *St. Charles Bank* v. *Denker,* 275 Mo. 607; *Silzer Co.* v. *Melton,* 129 Ga. 143; *Harrison* v. *Bank,* 127 Iowa 242; Fletcher, Corporations, vol. 3, § 2163.

The evidence was not admissible as a declaration against interest and does not measure up to any test prescribed for this extreme exception to the hearsay rule. *Mahaska* v. *Ingalls,* 16 Iowa 81; *Smith* v. *Moore,* 142 N. C. 277, 7 L. R. A. (N. S.) 684; *Halvansen* v. *Moon,* 87 Minn. 18; *Rand* v. *Dodge,* 17 N. H. 343; *Churchill* v. *Smith,* 16 Vt. 560; *Humes* v. *O'Brien,* 74 Ala. 64; *Berke-*

*ley Peerage Case,* 4 Camp. Rep. 401; *Sussex Peerage Case,* 2 C. & F. 85; *Estate of Baird,* 193 Cal. 225; *Smith* v. *Hansen,* 34 Utah 171, 18 L. R. A. (N. S.) 520; *Ins. Co.* v. *Hairston,* 108 Va. 832, 128 A. S. R. 989; *Tate* v. *Tate,* 75 Va. 522; *Massey* v. *Allen,* 13 Ch. Div. 558; *United States* v. *Donnelly,* 228 U. S. 242; *Xenia Bank* v. *Stewart,* 114 U. S. 224; Jones, Evidence, 3d ed., § 323. There was no evidence of the transmission of any sum by Doheny to Fall, except hearsay. *United States* v. *Donnelly, supra; Queen* v. *Hepburn,* 7 Cr. 290.

Neither the personal loan made by Mr. Doheny to Mr. Fall, nor any other fact proven in this case, constitutes a violation of public policy of such a nature as to render void or voidable the contracts and leases made and executed by Secretary Denby. No evidence of conspiracy or wrongdoing is afforded by correspondence between applicants for leases and various government officials, nor was it legally admissible.

The suit cannot be maintained without proof of pecuniary damage to the United States resulting from the contracts and leases attacked. *Smith* v. *Bolls,* 132 U. S. 125; *Sigafus* v. *Porter,* 179 U. S. 116; *Atlantic Co.* v. *James,* 94 U. S. 207; *Ming* v. *Woolfolk,* 116 U. S. 599; *Ins. Co.* v. *Bailey,* 13 Wall. 616; *Garrow* v. *Davis,* 15 How. 272; *Hyde* v. *Shine,* 199 U. S. 62; *United States* v. *Tin Co.,* 125 U. S. 273; *United States* v. *Conklin,* 177 Fed. 55; *Clarke* v. *White,* 12 Pet. 178.

The Transport Company is entitled to be credited with the value of the royalty oil delivered to it by the United States up to the amount of the expenditures made by it upon the property of the Government under the terms of the contracts. In equitable suits to rescind contracts, a defendant who has expended money or parted with value pursuant to the terms of the contract, has an equity by reason thereof which a court of equity will recognize and enforce as a condition of granting relief to the plain-

tiff. *Neblet* v. *McFarland,* 92 U. S. 101; *Marsh* v. *Fulton County,* 10 Wall. 684; *Stoffela* v. *Nugent,* 217 U. S. 499; *Levy* v. *Kress,* 285 Fed. 838; *Dold Packing Co.* v. *Doermann,* 293 Fed. 315; *Twin Lakes Co.* v. *Dohner,* 242 Fed. 402; *Shafer* v. *Spruks,* 225 Fed. 482; *Shearer* v. *Ins. Co.,* 262 Fed. 868; *United States* v. *Royer,* 268 U. S. 394; 2 Pomeroy, Eq. Jur., 3d ed., §§ 910, 1627; Story, Eq. Jur., 14th ed., § 957. This principle applies whether or not fraud or other form of bad faith be present. *Stoffela* v. *Nugent, supra; Dold Co.* v. *Doermann, supra.* It is not limited to cases where the plaintiff is wholly without remedy at law. *Canal Bank* v. *Hudson,* 111 U. S. 66; *Armstrong* v. *Ashland,* 204 U. S. 285. The maxim applies even though the contracts and leases were void because of lack of power to make them. If the innocent party sues in equity, the court will always recognize such equities as the guilty party possesses. *Diamond Coal Co.* v. *Payne,* 271 Fed. 362; *United States* v. *Royer, supra.* Even if there were a complete absence of power in the Secretary of the Navy to authorize the construction of the Pearl Harbor plant, nevertheless, there is no warrant for holding that the Transport Company, which actually went ahead and constructed the plant, is barred by any consideration of " public policy " from being entitled to retain the value which the Government delivered to it as against such construction, and from thereby avoiding the necessity of paying the Government twice for the value of all royalty oil received by it.

The United States was acting in its commercial capacity and not as a sovereign. *Cook* v. *United States,* 91 U. S. 389; *Hollerbach* v. *United States,* 233 U. S. 165; *Mann* v. *United States,* 3 Ct. Cls. 404; *United States* v. *N. Amer. Com. Co.,* 74 Fed. 151; *United States* v. *Fuller Co.,* 296 Fed. 180; *United States* v. *Bentley,* 293 Fed. 235; *United States* v. *Products Co.,* 300 Fed. 451; *Lyons* v. *United States,* 30 Ct. Cls. 352; *Bostwick* v. *United*

*States,* 94 U. S. 53. The United States is also bound by all rules regulating the remedy invoked which would apply if an individual were the plaintiff. *United States* v. *Thekla,* 266 U. S. 340; *The Western Maid,* 257 U. S. 419; *United States* v. *Stinson,* 197 U. S. 205; *McKnight* v. *United States,* 98 U. S. 179; *Brent* v. *Bank,* 10 Pet. 614; *United States* v. *Arredondo,* 6 Pet. 712. If the United States seeks to rescind a contract, it must restore or maintain the *status quo,* even though the defendant could not bring an affirmative action in equity or at law to reimburse himself. Cf. *Heckman* v. *United States,* 224 U. S. 447; *The Thekla, supra.*

The Circuit Court of Appeals also erred in refusing to the Petroleum Company the credit allowed by the District Court. Distinguishing, *Pine River Co.* v. *United States,* 186 U. S. 279; *Woodenware Co.* v. *United States,* 106 U. S. 432; *Union Stores* v. *United States,* 240 U. S. 284. None of these cases is applicable because in none of them did the party sued by the Government take possession and make expenditures pursuant to the terms of any contract which the Government had executed. In this case the United States is suing in its private capacity as a property owner. *Denver R. R. Co.* v. *United States,* 241 Fed. 614.

*Messrs. Owen J. Roberts* and *Atlee Pomerene* for the United States.

Where two courts have reached the same conclusion upon a question of fact it will be accepted here unless clearly erroneous. *Norton* v. *Larney,* 266 U. S. 511; *Adamson* v. *Gilliland,* 242 U. S. 350.

We have attempted to show that Secretary Denby was not informed and active in what he did in this connection; but it matters not whether he was informed or ignorant, if a corrupt money transaction took place with a Government official, thought and believed to have in-

fluence or power in connection with the making of these contracts and leases.

Nobody can read the record without being impressed with the constant activity of Fall in these matters, with the fact that whenever any critical situation arose Fall stepped in, and that it was his final say which made it possible for any of these papers to be placed before Secretary Denby for his signature; that always they went to Denby from Fall through Robison, and never direct, and that Robison, as the trial court has found, was so obsessed with getting storage facilities built with royalty oil rather than with appropriations by Congress that he was facile to do Fall's bidding and to bring about what he wanted by whatever means Fall suggested and approved. It will not do for a company whose president had an improper financial transaction with a government official, to say that upon the government rests the burden of proof that that transaction was the final and efficient cause of the execution of the contract between the company and the government. Nor will it do for it to assert that, even if the burden remains upon it, it has carried the burden by proving that the corrupt and improper bargain made between its president and the government official was ineffectual because, forsooth, that improper financial transaction took place between the president of the corporation and the wrong official of the government,—the one not in final control.

The moment a court is convinced by clear and indubitable proof that such a transaction occurred between a government official and a contracting party, it will nullify and set aside the dealings between the government and such contracting party, in which such official participated, on the ground that they are all infected by the improper transaction, and that no court, in case of the contracting party, will stop to appraise the effect and the harm that has been done by such improper transaction.

Mechem, Public Officers, p. 246, § 368; Kerr, Fraud and Mistake, 5th ed., p. 180.

Whether a " loan " or " gift," the money was paid with a full realization that it would tend to influence Fall in his official capacity. And it is clear that the transaction put Fall irrevocably in Doheny's power. Such a transaction was certainly a "bargain for a benefit " and certainly tended to induce Fall to neglect, ignore, exceed or violate his public duty. Whatever Fall's actual and legal relation to the contracts of April and December, he was then in fact an officer of the United States and active in the consummation of the contracts. Any duty he sustained in this behalf was a public duty, whether he acted *de facto* or *de jure*. In connection with appellants' contention that if Fall had not the legal power to act Doheny's transaction with him can have no effect upon the validity of the contract, see *Crocker* v. *United States,* 240 U. S. 74; *Garman* v. *United States,* 34 Ct. Cls. 237; *Atlantic Contr. Co.* v. *United States,* 57 Ct. Cls. 185; *Hume* v. *United States,* 132 U. S. 406; *Seltzer* v. *Met. Elec. Co.,* 199 Pa. 100; *Herman* v. *Oconto,* 100 Wis. 391; *Weston* v. *Syracuse,* 158 N. Y. 274; *Wash. Irr. Co.* v. *Krutz,* 1 .9 Fed. 279.

The statements of Doheny made before the Senate Committee on Public Lands were properly admitted in evidence, because he was an officer of the appellant corporations, acting for them and within the scope of his authority. *Xenia Bank* v. *Stewart,* 114 U. S. 224; *Fidelity Co.* v. *Courtney,* 186 U. S. 342; *Chicago* v. *Greer,* 9 Wall. 726; *Aetna Co.* v. *Auto Co.,* 147 Fed. 95; *Joslyn* v. *Cadillac Co.,* 177 Fed. 863; *Rosenberger* v. *Wilcox Co.,* 145 Minn. 408; *Kirkstall Co.* v. *Furness Ry. Co.,* L. R. 9 Q. B. 468; *Chicago Ry. Co.* v. *Coleman,* 18 Ill. 297; 2 Wigmore, Evidence, § 1048.

The statements were likewise properly admitted as declarations against interest. The pecuniary and pro-

prietary detriment to Mr. Doheny personally resulting from these statements is obvious. It is likewise clear that by claiming his constitutional privilege he made himself as though he were dead. Under these circumstances the statements were properly received in evidence as declarations against interest. *Weber* v. *R. R. Co.*, 175 Iowa 358; *Harriman* v. *Brown*, 8 Leigh 697; *Griffith* v. *Sauls*, 77 Tex. 630; 3 Wigmore, Evidence, § 1456; 4 Chamberlayne, Evidence, § 2771. These statements, however, are not the only testimony upon which the finding with regard to the $100,000 transaction rests.

The trial court properly admitted the evidence of Mrs. Edward L. Doheny, and evidence of communications between applicants for leases and various government officials during the period covered by the negotiation and execution of the contracts and leases in question.

Pecuniary damage to the United States was shown; but in the absence of any such showing the decree against the appellants was justified and required. Appellants have entered into possession and extracted large quantities of oil, gas, and other petroleum products. This waste not only runs into several millions of dollars, but also has impaired the value of the leased lands by reason of the mineral extracted therefrom. No burden rests upon the United States to establish as a condition precedent to its right to relief that the contracts and leases are not commercially good ones and that better ones might have been obtained. Because of its baneful tendency, equity is eager to do all it can to redress this kind of a fraud by a fiduciary. *United States* v. *Carter*, 217 U. S. 286; *Findlay* v. *Pertz*, 66 Fed. 427; *Michoud* v. *Girod*, 4 How. 502; *Robertson* v. *Chapman*, 152 U. S. 673; *Com. S. S. Co.* v. *Amer. Ship Co.*, 197 Fed. 780. The books are full of cases where the United States has brought suit to cancel patents granted illegally or fraudulently. *Causey* v. *United States*, 240 U. S. 399; *United States* v. *Trinidad*

*Co.,* 137. U. S. 160; *Diamond Co.* v. *Payne,* 271 Fed. 362; *United States* v. *Poland,* 251 U. S. 221; *Heckman.* v. *United States,* 224 U. S. 413; *Curtis Co.* v. *United States,* 262 U. S. 215; *United States* v. *Sou. Pac. Co.,* 251 U. S. 1; *Wright Co.* v. *United States,* 236 U. S. 397; *Wash. Sec. Co.* v. *United States,* 234 U. S. 76; *Diamond Coal Co.* v. *United States,* 233 U. S. 236; *United States* v. *Kettenbach,* 208 Fed. 209. A violation of the public statutes is in itself ground for cancellation and rescission in equity. See *Hammerschmidt* v. *United States,* 265 U. S. 182. A court will always presume injury where favoritism was shown to the contracting party by government officials, and will more readily do so where, as here, there is an admission of an enormous profit to be made out of a contract granted by private negotiation to a favored party and where, also, performance under the contract shows that the expected profits will, in all probability, be realized.

The Act of June 4, 1920, did not authorize the execution of the contracts and leases. The purpose of the Act was to enlarge the powers of the Secretary of the Navy so that he might at will provide adequate protection against drainage where such was needed. The underground reserve idea had been in well known effect in the case of reserves Nos. 1 and 2 since their withdrawal by President Taft in 1912. It was impliedly ratified by Congress in 1920, in that the Leasing Act of February 25, 1920, conferred a right to lease land in the naval reserves only where there were already producing wells and in compromise of valid existing claims. Had Congress intended or expected a sharp departure from this established policy presumably some definite indication to that effect would be found in the Act of June 4th. Instead, this short enactment, which is itself a mere rider to the Naval Appropriation Act for the fiscal year 1921, begins its operative language with reference to the naval re-

serves by the word "conserve." The further language
of the Act does give the Secretary of the Navy an un-
restricted power as to how much of the lands he shall
lease. We think, however, that it shows an assumption
on the part of Congress that this power was needed, and
presumably therefore would be exercised, for more ade-
quately protecting the reserves against drainage from
neighboring drillers.

That this would render advisable development of cer-
tain portions of the land by leases under which royalty
oils would accrue to the United States, and that such
oils, or part of them, would be sold, is apparent from the
Act. From the sales of royalty oil a sum of $500,000 is
made available to enable the Secretary to carry out the
necessary development and storage which might be inci-
dent to protection of the reserves. This was a reason-
able provision for such purpose if Congress contemplated
only such development as was needed for protection.
It was a wholly and ridiculously insignificant appropria-
tion if Congress contemplated that the Secretary of the
Navy would suddenly throw the reserves open to unlim-
ited exploitation. There were, in all, three petroleum
reserves with a total acreage of nearly eighty thousand
acres, and in addition two shale-oil reserves. Had Con-
gress anticipated the full development of such a vast and
rich reservoir of oil, some indication of that expectation
and some provision for the disposal of the resulting prod-
ucts or money would be found in the Act; something on
such a subject would have found its way into the debates
of Congress or the reports of committees.

If we look to departmental construction of the purpose
of the Act, we find that the established policy of an
underground reserve was rigidly adhered to. Not until
Secretary Fall kindled the imagination of certain en-
thusiasts in the Navy Department in the summer of 1921,
with the idea of an exchange for storage proposition, did
the thought occur to anyone even to investigate as to

whether the Act permitted such a policy. Further, the record shows that down to the very end of all the transactions here involved, the Secretary of the Navy maintained a fixed purpose of leasing only where such leasing was required as a protective measure. Robison knew this was the policy of his chief and the policy of Congress.

Prior to the Act of June 4, 1920, the royalty oil accruing to the Government from compromise leases made on Naval Reserve Lands, was, pursuant to the Leasing Act of February 25, 1920, sold; and the receipts from such sales were paid into the Treasury. This was the express mandate of the Act of February 25, 1920. After the passage of the Act of June 4, 1920, any cash received from sales of royalty oil from leases made pursuant to it would also go into the Treasury as miscellaneous receipts (Rev. Stats. §§ 3617, 3618), providing that all moneys received from the sale of government property, shall be covered into the Treasury. Everyone recognized that under the Act of June 4, 1920, the royalty crude oil coming to the Government under any leases theretofore made or thereafter to be made on lands in the naval reserves could be exchanged for fuel oil and other petroleum products useable by the Navy in its current operations. Nobody suspected or suggested apparently that the royalty oil could itself be used as a consideration for the procurement by the Navy of other physical property and assets, until more than a year after the Act of June 4, 1920, became law.

In the latter part of 1921, Fall and Robison developed the plan of so using royalty oil and attempted to justify its use under the Act of June 4, 1920. This plan soon enlarged itself into a program for the taking out of all the petroleum in the reserves, thus reversing the policy adopted by Congress and adhered to for many years, and using the royalty oil coming from the lessees for the construction of structures and filling them with petroleum

products useable by the Navy. The expedient was adopted of " exchanging " the crude oil for so-called reserve fuel oil and petroleum products, and, as an ancillary matter, " exchanging " this royalty crude oil also, and in addition, under construction contracts for the building of naval fuel depots in which the fuel oil and petroleum products acquired were to be stored at various points in the United States and its possessions.

Not only was the Act passed in pursuance of a conservation policy, but, disregarding all other statutory and constitutional provisions, and supposing it stood alone, it does not confer an authority for the making of the contracts under attack. " To use " connotes consumption, but when we examine the last two provisos of the Act, we find the " use " specifically limited. The one proviso appropriates " not exceeding $500,000 " of the moneys turned in or to be turned into the Treasury from royalties on Naval Reserve lands prior to July 1, 1921, " for this purpose." So that any " use " that is to be made of the oil must not cost in excess of that sum. The other proviso makes clear that " use " means " consumption " for it requires that the $500,000 appropriation shall be " reimbursed from the proper appropriations, on account of the oil and gas products from said properties used by the United States at such rate not to exceed the market value of the oil as the Secretary of the Navy may direct." It is, therefore, clear that if the Government " uses " this oil for any purpose for which Congress has appropriated money for the purchase of oil, such appropriation must be debited and the appropriation made in the Act of June 4, 1920, must be credited with the value of the royalty oil so " used."

The power to " store " covers both royalty crude oil and products of the royalty oil. There are certain products, such as gasoline and gas, which are obtained from royalty crude oil. As the Secretary is given power to operate the

reserves by contract or otherwise, he might make a contract whereby the operator would turn over to him crude oil and products of the crude oil, which he might store. What may be spent for this purpose? The answer is found in the next proviso. There is " made available " " not exceeding $500,000 " " for this purpose." Moreover, these contracts are not for the storage of " the oil and gas products " of the naval reserve lands, nor for the storage of the " products " of such oil and gas.

The " exchange " contemplated was limited to fuel oil and other derivatives of petroleum. It could not extend to the acquisition of anything which might be of benefit to the United States. In holding that it did so extend, the Judge Advocate General of the Navy fell into grave error. He held the word to be unlimited.

The transactions under the contracts of April 25 and December 11, 1922, are not in fact exchanges within the meaning of the Act. Not only the nature of the transaction, but the language used by the parties, shows that they realized a sale was being consummated, and not an exchange. The legal concept of an exchange as distinguished from a sale is a transaction whereby little or no emphasis is placed upon value; whereby the parties intend to trade one specific article for another specific article or articles of property. When the element of value creeps in as a primary consideration we have a sale and purchase rather than an exchange. The power " to sell " was to sell for a money consideration only.

The Act itself, by an appropriation, provides the means of storage. The following acts: Rev. Stats. §§ 3732, 3733; 1906, c. 3078, 34 Stat. 255; 1906, c. 3914, 34 Stat. 764, § 9, forbid any contract being entered into, such as those in issue in this case, which will bind the Government to pay a larger sum than the amount in the Treasury appropriated for the specific purpose, un-

42847°—27——31

less the Act shall in specific terms declare that·such con-. tract may be executed. *Sutton* v. *United States,* 256 U. S. 575; *Hooe* v. *United States,* 218 U. S. 322; *Chase* v. *United States,* 155 U. S. 489; *Bradley* v. *United States,* 98 U. S. 104, are typical cases showing that this Court construes this matter strictly and never from a general authority to contract or to do a certain act conferred upon an executive official draws the conclusion that the policy of Congress touching the limitation of projects by appropriation was intended to be overruled or an exception created. The last proviso requires the appropriation of $500,000 to be reimbursed from the proper appropriation on account of the use of the royalty oil. The appropriation of $500,000 is itself an appropriation for the procurement of storage.

The contracts were violative of the law as to the location and establishment of fuel depots. The power to establish depots of coal and other fuel was delegated to the Secretary of the Navy under the Act of August 31, 1842, 5 Stat. 577, which later became Rev. Stats. § 1552. This delegation was subsequently revoked. Act of March 4, 1913, 37 Stat. 898. See House Report, 62d Cong., 3d Sess. In appropriation acts from 1914 onward, the various fuel depot projects are specifically mentioned and a separate appropriation is made for each. Upon the repeal of Rev. Stats. § 1552, the exclusive authority to locate and establish fuel depots was revested in Congress by virtue of the Constitution.

The contracts of April 25 and December 11, 1922, were not made by advertisement and competitive bidding, as required by law. Rev. Stats. § 3709; *United States* v. *Purcell Co.,* 249 U. S. 313; *United States* v. *Ellicott,* 223 U. S. 524. The Act of June 4, 1920, did not repeal or supersede prior general statutes on fuel depots, competitive bidding, Government contracts, and the sale of Gov-

ernment property. See *Gt. Nor. Ry.* v. *United States,* 208 U. S. 452; *Erie Coal Corp.* v. *United States,* 266 U. S. 518; *United States* v. *Barnes,* 222 U. S. 513; *Robertson* v. *Labor Board,* 268 U. S. 619; *In re East River Co.,* 266 U. S. 355; *United States* v. *Sweet,* 245 U. S. 563; *Panama R. R. Co.* v. *Johnson,* 264 U. S. 375; *United States* v. *Greathouse,* 166 U. S. 601; *Ex parte Webb,* 225 U. S. 663; *Washington* v. *Miller,* 235 U. S. 422; *Bookbinder* v. *United States,* 287 Fed. 790; *Witte* v. *Shelton,* 240 Fed. 265; *United States* v. *Noce,* 268 U. S. 613.

The provisions of the contracts and leases constituted an illegal attempt to delegate the power conferred upon the Secretary of the Navy by the Act of June 4, 1920. The trial court held that the Executive Order, so far as it attempted to transfer the administration of the reserves to the Secretary of the Interior and pass over to him discretionary powers vested in the Secretary of the Navy, was void and of no effect. We understand that counsel for appellants concur in this view. By the contract of April 25, 1922, the Secretary of the Navy purported to transfer the procurement of fuel oil and of storage tankage therefor, dredging, docking, etc., at the Pearl Harbor Naval Station to the Secretary of the Interior. He further purported to transfer the entire administration over half of Naval Reserve No. 1 and its leasing to the Secretary of the Interior. Under the contract and lease of December 11, 1922, no power of any kind is left in the Secretary of the Navy.

The United States is not estopped to have these contracts rescinded because they have been executed. *Filor* v. *United States,* 9 Wall. 45; *Utah Power Co.* v. *United States,* 243 U. S. 389; *Chanslor-Canfield Co.* v. *United States,* 266 Fed. 145; *Bayou Club* v. *United States,* 260 U. S. 561. That there is no power in an official, in whom discretionary powers have been vested by law, to delegate them is well settled. *Light Co.* v. *Dunn,* 62 Cal. 580;

*Brummett* v. *Ogden Co.*, 33 Utah 285; *Oakland* v. *Carpentier*, 13 Cal. 540; *Mann* v. *Richardson*, 66 Ill. 481; *Mullarky* v. *Cedar Falls*, 19 Iowa 21; *Clark* v. *Washington*, 12 Wheat. 40; *People* v. *Street Co.*, 225 Ill. 470.

The contracts of April 25 and December 11, 1922, are not in any proper sense of the word *ultra vires* contracts. They are contracts contrary to public policy, violative of the expressed will of the legislative branch of the Government and on their face utterly null and void.

The companies are not entitled to be credited with their respective disbursements under the fraudulent and illegal contracts and leases. Allowance of credit for the Pearl Harbor project would be subversive of the "fuel depot" policy of the United States and in violation of the law of illegal public contracts. This Court has repeatedly held that the equitable maxim, "He who seeks equity must do equity," should have no place in an equitable proceeding brought by the United States to enforce a public statute and its underlying policy. *Causey* v. *United States*, 240 U. S. 399; *United States* v. *Trinidad Coal Co.*, 137 U. S. 160; *Heckman* v. *United States*, 224 U. S. 413; *Wash. Sec. Co.* v. *United States*, 234 U. S. 76; *United States* v. *Poland*, 251 U. S. 221; *Diamond Co.* v. *Payne*, 271 Fed. 362. One dealing with public officers is bound to take notice of the extent of their powers and assumes the risk of their acting strictly within their official authority. *Sutton* v. *United States*, 256 U. S. 575; *Whiteside* v. *United States*, 93 U. S. 247; *The Floyd Acceptances*, 7 Wall. 666; *Chase* v. *United States*, 155 U. S. 489; *Hooe* v. *United States*, 218 U. S. 322; *Utah Power Co.* v. *United States*, 243 U. S. 389; *United States* v. *Levinson*, 267 Fed. 692; *United States* v. *Bentley*, 293 Fed. 229.

That the United States received full value for every dollar spent, does not save an illegal government contract.

*Filor* v. *United States,* 9 Wall. 45. The United States may not be estopped by the unlawful acts of its public officers. *Bayou Club* v. *United States,* 260 U. S. 561.

Allowance of credit for expenditures and improvements on Naval Petroleum Reserve No. 1 would be in violation of the law governing *mala fide* trespasses upon the public domain. The wilful trespasser not only must account for the full market value of all minerals extracted from public lands, together with any and all accretions thereto, but also forfeits all permanent improvements to the realty. In no event is he permitted to improve the United States out of its lawful property or to make a profit at its expense, and his actual costs in extracting the mineral are never recoverable. *Pine River Co.* v. *United States,* 186 U. S. 279; *Woodenware Co.* v. *United States,* 106 U. S. 432; *Benson Co.* v. *Atla Min. Co.,* 145 U. S. 428; *Guffey* v. *Smith,* 237 U. S. 101; *Union Stores* v. *United States,* 240 U. S. 284; *Big Sespe Co.* v. *Cochran,* 276 Fed. 216. The shield of " color of title " may never be raised by fraudulent trespassers in their own defense. *Big Sespe Co.* v. *Cochran, supra.*

MR. JUSTICE BUTLER delivered the opinion of the Court.

This suit was brought by the United States in the northern division of the southern district of California against the petitioners, Pan American Petroleum and Transport Company and Pan American Petroleum Company. The former will be called the Transport Company and the latter the Petroleum Company. The relief sought is the cancelation of two contracts with the Transport Company, dated April 25, and December 11, 1922, and two leases of lands in Naval Petroleum Reserve No. 1, to the Petroleum Company, dated June 5 and December 11, 1922, an injunction, the appointment of receivers, and an accounting. The complaint alleges that the con-

tracts and leases were obtained and consummated by means of conspiracy, fraud and bribery, and that they were made without authority of law. Receivers were appointed to take possession of and operate the properties pending the suit. At the trial the court heard much evidence and later made findings of fact; stated its conclusions of law; announced an opinion, 6 F. (2d) 43, and entered its decree. It adjudged the contracts and leases void and ordered them canceled; it directed the Petroleum Company to surrender the lands and equipment, and stated an account between the United States and each of the companies. The Transport Company was charged the value of petroleum products received by it and the amount of profits derived upon their resale, and was given credit for the actual cost of construction work performed and of fuel oil delivered under the contracts. The Petroleum Company was charged the value of the petroleum products taken under the leases and given credit for actual expenditures in drilling and operating wells and making other useful improvements. Interest was added to each of the items. The companies appealed to the Circuit Court of Appeals, and the United States took a cross appeal. That court affirmed the decree so far as its awards affirmative relief to the United States and reversed that part which gives credit to the companies. 9 F. (2d) 761.

Under R. S. §§ 2319, 2329, and the Act of February 11, 1897, c. 216, 29 Stat. 526, public lands containing oil were open to settlement, exploration and purchase. Exploration and location were permitted without charge, and title could be obtained for a nominal amount. *United States* v. *Midwest Oil Co.*, 236 U. S. 459, 466. Prior to the autumn of 1909 large areas of public land in California were explored; petroleum was found, patents were obtained, and large quantities of oil were taken. In September of that year, the director of the Geological Survey

reported that, at the rate oil lands in California were being patented, all would be taken within a few months. and that, in view of the increased use of fuel oil by the Navy, there appeared to be immediate need for conservation. Then the President, without specific authorization of Congress, by proclamation withdrew from disposition in any manner specified areas of public lands in California and Wyoming amounting to 3,041,000 acres. By the Act of June 25, 1910, c. 421, 36 Stat. 847, Congress expressly authorized the President to withdraw public lands containing oil, gas and other minerals. An executive order of July 2, 1910, confirmed the withdrawals then in force. By a later order, September 2, 1912, the President directed that some of these lands " constitute Naval Petroleum Reserve No. 1 and shall be held for the exclusive use or benefit of the United States Navy until this order is revoked by the President or by Act of Congress." This Reserve includes all the lands involved in this suit. By a similar order, December 13, 1912, the President created the Naval Petroleum Reserve No. 2.

The Leasing Act of February 25, 1920, c. 85, 41 Stat. 437, regulates the exploration and mining of public lands, and authorizes the Secretary of the Interior to grant permits for exploration and make leases covering oil and gas lands, exclusive of those withdrawn or reserved for military or naval purposes. The Act of June 4, 1920, c. 228, 41 Stat. 812, 813, appropriated $30,000 to be used, among other things, for investigating fuel for the Navy and the availability of the supply allowed by naval reserves in the public domain. It contains the following: " *Provided,* That the Secretary of the Navy is directed to take possession of all properties within the naval petroleum reserves . . . to conserve, develop, use, and operate the same in his discretion, directly or by contract, lease, or otherwise, and to use, store, exchange, or sell the oil and gas products thereof, and those from all roy-

alty oil from lands in the naval reserves, for the benefit of the United States: . . . *And provided further,* That such sums as have been or may be turned into the Treasury of the United States from royalties on lands within the naval petroleum reserves prior to July 1, 1921, not to exceed $500,000, are hereby made available for this purpose until July 1, 1922: *Provided further,* That this appropriation shall be reimbursed from the proper appropriations on account of the oil and gas products from said properties used by the United States at such rate, not in excess of the market value of the oil, as the Secretary of the Navy may direct."

March 5, 1921, Edwin Denby became Secretary of the Navy and Albert B. Fall, Secretary of the Interior. May 31, 1921, the President promulgated an executive order purporting to commit the administration and conservation of all oil and gas bearing lands in the Reserves to the Secretary of the Interior, subject to the supervision of the President.

The contract, dated April 25, 1922, was executed on behalf of the United States by the Acting Secretary of the Interior and by the Secretary of the Navy. The Transport Company agreed to furnish at the Naval Station at Pearl Harbor, Hawaii, 1,500,000 barrels of fuel oil and deliver it into storage facilities there to be contructed by the company according to specifications of the Navy. The Company was to receive its compensation in crude oil to be taken from the Reserves. The quantity, on the basis of the posted field prices of crude oil prevailing during the life of the contract, was to be the equivalent of the market value of the fuel oil and also sufficient to cover the cost of the storage facilities. The United States agreed to deliver to the company at the place of production month by month all the royalty oil furnished by lessees in Reserves Nos. 1 and 2 until all claims under the contract were satisfied. It was stipulated that if production of crude oil

should decrease so as unduly to prolong performance, "then the Government will, in the discretion of the Secretary of the Interior, grant additional leases on such lands as he may designate in naval petroleum reserve No. 1 as shall be sufficient to maintain total deliveries of royalty oil under this contract at the approximate rate of five hundred thousand barrels (500,000) per annum." And, by Article XI of the contract, it was agreed that, if during the life of the contract such additional leases should be granted within specified areas, "the contractor shall first be called upon by the Secretary of the Interior to meet such drilling conditions and to pay such royalties as the Secretary may deem just and proper, and in the event of his acceptance . . . the contractor shall be granted by the Government a preferential lease on such tracts as the Secretary of the Interior may decide to lease. In the event of the failure of the contractor to agree . . . then said lease or leases may be offered for competitive bidding, but the contractor shall have a right to submit a bid on equal terms with others engaged in said bidding."

The lease of June 5, 1922, was signed by the Assistant Secretary of the Interior. It was made in accordance with a letter of April 25, 1922, signed by the Acting Secretary of the Interior and the Secretary of the Navy, and sent to J. J. Cotter, who was Vice-President of the Transport Company. It covered the quarter section described in the letter. This lease was assigned to the Petroleum Company.

The contract dated December 11, 1922, is signed for the United States by the Secretary of the Interior and the Secretary of the Navy. It declares that it is desired to fill storage tanks at Pearl Harbor promptly as they are completed and also to procure additional fuel oil and other petroleum products in storage there and elsewhere; that the Secretary of the Navy requested the Secretary of the

Interior as administrator of the Naval Petroleum Reserves
to arrange for such products in storage and to exchange
therefor additional royalty crude oil, " the probable cost
of the additional products and storage immediately
planned for being estimated at fifteen million dollars more
or less "; that this cannot be done on the basis of exchange
for the crude oil coming to the Government under the
present leases; that, under the contract of April 25, 1922,
the company is granted preferential right to leases to cer-
tain lands in Naval Reserve No. 1; and that the company
was planning to provide refinery facilities at Los Angeles,
together with pipe lines from the field to the refinery and
docks, and to erect storage having capacity of 2,000,000
barrels or more. The company agreed to furnish, as
directed by the Secretary of the Interior, the fuel oil in
storage at Pearl Harbor covered by the earlier contract; to
construct for actual cost additional storage facilities there,
as required, up to 2,700,000 barrels; to furnish fuel oil and
other petroleum products in the proposed storage as and
when completed on the basis of market prices plus trans-
portation cost at going rates; to furnish without charge,
until expiration of the contract, storage for 1,000,000 bar-
rels of fuel oil at Los Angeles; to fill it with fuel oil for
the Navy at such time as Government royalty oil should
be available for exchange, and to bunker Government
ships from such oil at cost; to maintain for 15 years sub-
ject to the demands of the Navy 3,000,000 barrels of fuel
oil in the company's depots at Atlantic Coast points; to
furnish crude oil products and storage facilities at other
points, designated by the Government, when sufficient
crude oil has been delivered to satisfy the Pearl Harbor
contract; to sell the Navy at ten per cent. less than market
price additional available fuel oil produced from the re-
serves and manufactured products from its California
refineries; to credit the Navy for crude oil at published
prices and for gas and casinghead gasoline at prices fixed

in the leases, and to satisfy any surplus credits of the Government by delivery of fuel oil or other petroleum products, by construction of additional storage facilities, or by payment in cash as the Government might elect. The United States agreed to deliver to the company in exchange all royalty oil, gas, and casinghead gasoline produced on Reserves Nos. 1 and 2 until its obligations were discharged and in any event for fifteen years after the expiration of the contract of April 25, 1922 [which was without specified time limit], and to lease to the company all the unleased lands in Reserve No. 1.

The lease of December 11, 1922, is signed for the United States by the Secretary of the Interior and the Secretary of the Navy. It covers all unleased lands in Reserve No. 1, but with a provision that no drilling shall be done on approximately the western half without the lessor's consent. It runs for twenty years and so long thereafter as oil or gas is produced in paying quantities. The royalties range from 12½ to 35 per cent.

A Joint Resolution adopted by the Senate and House of Representatives and approved by the President, February 8, 1924, 43 Stat. 5, stated that it appeared from evidence taken by the Committee on Public Lands and Surveys of the Senate that the contract of April 25, 1922, and the lease of December 11, 1922, were executed under circumstances indicating fraud and corruption, without authority on the part of the officers purporting to act for the United States and in defiance of the settled policy of the Government to maintain in the ground a great reserve supply of oil adequate to the needs of the Navy. It declared the contracts and leases to be against public interest and that the lands should be recovered and held for the purposes to which they were dedicated. And it authorized and directed the President to cause suit to be prosecuted for the annulment and cancelation of the lease and all contracts incidental and supplementary thereto,

and to prosecute such other action or proceedings, civil and criminal, as might be warranted.

The findings contain what in abridged substance follows:

E. L. Doheny controlled both companies. Fall was active in procuring the transfer of the administration of naval petroleum reserves from the Navy Department to the Interior. And, after the executive order was made, he dominated the negotiations that eventuated in the contracts and leases. From the inception no matter of policy or action of importance was determined without his consent. Denby was passive throughout, and signed the contracts and lease and the letter of April 25, 1922, under misapprehension and without full knowledge of their contents. July 8, 1921, Fall wrote Doheny: " There will be no possibility of any further conflict with Navy officials and this Department, as I have notified Secretary Denby that I should conduct the matter of naval leases under the direction of the President, without calling any of his force in consultation unless I conferred with himself personally upon a matter of policy. He understands the situation and that I shall handle matters exactly as I think best and will not consult with any officials of any bureau in his Department, but only with himself, and such consultation will be confined strictly and entirely to matters of general policy." After that Doheny and his companies acted upon the belief that Fall had authority to make the contracts and leases. Doheny and Fall conferred as to a proposal to be made by the Transport Company whereby it should receive from the United States royalty oil for constructing storage facilities at Pearl Harbor and filling them with fuel oil. They discussed the matter of granting other leases in Reserve No. 1. They also discussed a petition of the Petroleum Company for reduction of royalties under an existing lease. Fall and Admiral John K. Robison, per-

sonal representative of the Secretary of the Navy in naval reserve matters, agreed that the proposed contract should be kept secret so that Congress and the public should not know what was being done. [But it is to be said that Robison's motives in this were not the same as Fall's.]

November 28, 1921, Doheny submitted to Fall a proposal stating that, in accordance with a suggestion from Fall, he had made inquiries as to cost of constructing storage for 1,500,000 barrels of fuel oil at Pearl Harbor. He gave in detail figures relating to such cost, the price of crude oil in the field and of fuel oil at Pearl Harbor, and stated the total amount of crude oil necessary to pay for the tanks and fuel oil " on the basis of our being paid for both tanks and oil in royalty crude oil produced from lands within the naval reserves and to be leased to us." The letter concluded: " I suppose you will turn this matter over to First Assistant Secretary Finney, who, with Rear Admiral Robison, may arrange the details of it during your absence, and as I also expect to be absent, I am confidentially furnishing Mr. Cotter with the information so that he can intelligently discuss the matter with Mr. Finney." And the next day Fall wrote Robison: " Mr. Cotter will wait upon you with data, etc., with relation to oil tanks and royalty oils in connection with Pearl Harbor demands. I have asked him also to hand you, for your inspection, the original of a letter from Colonel Doheny addressed to myself, containing a résumé of the data. Should you think best to accept this proposition then of course it would be necessary, in my judgment, to turn over to Col. Doheny, if we can do so, leases upon further wells or area in the naval reserve in which he is now drilling. If this is done it must be understood that the royalty must be made less than are the present royalties being paid by the Midway and Pan American." The letter stated that the gas pressure was lessening and that the companies were suffering loss in the payment of the

55 per. cent. royalty. " If you approve the proposition, will you kindly indicate to me such approval by simple endorsement upon Col. Doheny's letter to myself, signed by yourself. Your simple O. K. will be sufficient."

Doheny had agreed to advance $100,000 to Fall as and when he should need it. November 30, at Fall's request, Doheny sent him $100,000 in currency. The money was obtained in New York on the check of Doheny's son who carried it to Washington and gave it to Fall. And Fall sent to Doheny by the son a demand note for $100,000. No entry of the advance was made in the accounts of Doheny or the petitioners. Nothing has been paid on account of principal or interest. At that time it was understood between Doheny and Fall that the latter need not repay it in kind. Doheny intended, if Fall did not dispose of a certain ranch in New Mexico, to cause the Transport Company to employ him at a salary sufficient to enable him, out of one-half of it, to pay off the amount in five or six years; and he knew that Fall expected to leave the service of the Government and accept employment with one of his companies. A few weeks after it was given, Doheny tore Fall's signature off the note so that it would not be enforceable in the hands of others. December 1, Fall gave instructions to subordinates that the petition of the Petroleum Company for reduction of royalties should not be granted but that, as relief, the company be given another lease at regulation royalties.

Long in advance of receipt of bids Fall knew that the Transport Company would offer to construct storage facilities at cost and to fill them with fuel oil in exchange for royalty oil and for the assurance that other leases on lands in Reserve No. 1 would be granted to it. Others were not advised that the United States would consider a bid conditioned on assurance to the bidder of other leases or preferential right to leases. Due to the interest of Fall, the Transport Company had opportunities for conference with

and advice from those acting for the United States which were not given to others. There were five other oil companies with which officers or employees of the United States conferred as to the proposed contract. Fall knew that two of these would not bid because they considered the proposed contract illegal; that two of the others had not been invited to bid, and that the other one would refuse to bid unless authority for the contract should be obtained from Congress. Invitation for proposals was sent two construction companies; but Fall understood and stated that it was impossible for either of them to bid because payment had to be made in royalty oil. April 13, Fall left Washington for Three Rivers, New Mexico. Before leaving he gave instructions that no bids should be accepted or contract awarded without his consent. The bids were opened April 15. Four were received; one was conditioned upon Congressional approval of the contract; one did not cover the construction work and applied only to furnishing the fuel oil; the other two proposals were from the Transport Company: one of them, designated A, was in accordance with the invitation for bids, but the other, called B, was not. The latter named the smaller lump sum in barrels of crude oil; it stated that if actual cost was less than a specified amount the saving should be credited to the Government; and it was conditioned upon granting the bidder preferential right to become lessee in all leases that thereafter might be granted by the United States for recovery of oil and gas in Reserve No. 1. On April 18, Edward C. Finney, Acting Secretary of the Interior, telegraphed Fall that certain officials and employees of the United States recommended acceptance of proposal B; on the same day Fall consented by telegram, and Finney sent a letter to the company purporting to award the contract to it. Cotter then stated that the Transport Company did not desire to make the contract unless the United States would agree, within twelve

months, to grant the company a lease or leases of lands in Reserve No. 1. He also raised the question whether the executive order of May 31, 1921, had any legal force and refused to permit the company to make the contract unless Denby should sign as Secretary of the Navy. April 20, Arthur W. Ambrose of the Bureau of Mines was sent from Washington to Three Rivers with the papers in the case. He was instructed to consult Fall as to whether Denby should be made a party to the contract. April 23, Fall by telegram agreed that Denby should be made a party and directed Finney to execute the contract for the Department of the Interior. While it is not clearly shown that Ambrose took with him a draft of the letter of April 25, signed by Denby and Finney and sent to Cotter, he was instructed to, and did, consult Fall concerning it. That letter declares that the company's proposals were the lowest received by the Government. After stating that, expressed in money, proposal B is the better by $235,-184.40, and by the possible saving by performance for less than the estimated cost of construction, it said: " It is evident from our conversation of April 18 that your interpretation of preferential right was to the effect that the . . . Transport Co. desired the right to lease certain specified land in naval petroleum reserve No. 1 as well as preferential right to lease other land in naval petroleum reserve No. 1 to the extent described in Article XI of contract. It is also my understanding from your conversation that unless the . . . Transport Co. could get a lease to certain lands, your company would not desire to enter into a contract under the terms outlined in proposal (B) and preferred the government would accept proposal (A)." The letter then stated that the Department favored proposal B and reiterated its stated advantages over the other proposal. Then it said: " In order that the Government may take advantage of a contract embodying the terms outlined in proposal (B), I wish to advise you that

the Department of the Interior will agree to grant to the
. . . Transport Co. within one year from the date of
the delivery of a contract relative to the Pearl Harbor
project leases to drill the following tracts of land." The
letter specified the quarter section covered by the lease of
June 5, 1922, and an additional strip, and stated that the
royalties to be required would not be greater than speci-
fied rates ranging from 12½ to 35 per cent. The prefer-
ential right was inserted to prevent competition. The
assurance that additional leases would be given was not
necessary or required under proposal B.

After the making of the contract of April 25, the posted
field price of crude oil declined rapidly. In the autumn
of 1922 the Transport Company and Doheny were in cor-
respondence or consultation with Fall for the purpose of
at once securing additional leases in Reserve No. 1.
Doheny submitted a proposition to Fall which the latter
delivered to his subordinates with his favorable recom-
mendation. Later Doheny enlarged the proposition, and
there followed negotiations concerning the proposed lease.
Doheny and Fall agreed upon a schedule of royalties.
The lease of December 11 was arranged without competi-
tion of any kind. Plans for the proposed construction
work had not been prepared. Before the contract and
lease were made Fall and others in his Department stated
to persons making inquiries that it was not the intention
to make leases or to drill in that Reserve. The danger of
drainage had been eliminated by agreement between the
United States and oil companies operating in the vicinity
that no drilling should be done by either except on six
months' notice to the other.

The District Court concluded that the contracts and
leases were obtained by corruption and fraud. On their
appeal, petitioners challenged practically all the findings
of the trial court. The Circuit Court of Appeals, after

42847°—27——32

stating the issue and the substance of the facts found and conclusions reached below, said: " We find no ground for disturbing the findings of fact which we deem essential to the decision of the case, and while the evidence may be insufficient to support certain contested findings the disputed facts, in view of our conclusions upon the law applicable to the case, become of little importance." The petitioners here argue that the Secretary of the Navy did in fact exert the authority conferred by the Act of June 4, 1920, and that Fall did not dominate the making of the contracts and leases; that it was not proved by any evidence competent or admissible against the companies that Doheny gave Fall $100,000; that the giving of the money did not affect the transaction; that it was a loan and not a bribe, and that the record does not sustain the conclusion of the District Court.

We have considered the evidence, and we are satisfied that the findings as to the matters of fact here controverted are fully sustained, except the statement that Denby signed the contracts and leases under misapprehension and without full knowledge of the contents of the documents. As to that the record requires an opposite finding. Under the Act of June 4, 1920, it was his official duty to administer the oil reserves; he was not called as a witness, and it is not to be assumed that he was without knowledge of the disposition to be made of them or of the means employed to get storage facilities and fuel oil for the Navy. He is presumed to have had knowledge of what he signed; there are direct evidence and proven circumstances to show that he had. But the evidence sustains the finding that he took no active part in the negotiations, and that Fall, acting collusively with Doheny, dominated the making of the contracts and leases.

The finding that Doheny caused the $100,000 to be given to Fall is adequately sustained by the evidence.

Early in 1924, during the investigation of these contracts and leases by the Senate Committee, Doheny voluntarily appeared as witness and there gave testimony for the purpose of explaining the money transaction between him and Fall at the time the initial contract was being negotiated. At the trial of this case, over objections of the companies, his statements before the committee were received in evidence. Petitioners insist that they were not admissible. But Doheny acted for both companies when the contracts and leases were negotiated. He controlled the voting power of one that owned all the shares of the other. He was President of the Petroleum Company up to July 24, 1922, and then became Chairman of its board. He was President of the Transport Company until December 7, 1923, when he became Chairman of its board. He was Chairman of both when he testified. There is no evidence that his control over or authority to act for these companies was less in 1924, when he appeared for them before the committee, than it was in 1921 and 1922, when he negotiated and executed the contracts and leases. The companies were much concerned as to the investigation lest it might result in an effort to set aside the transaction. The hearing before the committee was an occasion where it was proper for them to be represented. Doheny had acted for them from the inception of the venture. The facts and circumstances disclosed by the record justified the lower courts in holding that, when he testified before the committee, he was acting for the companies within the scope of his authority. His statements on that occasion are properly to be taken as theirs, and are admissible in evidence against them. *Chicago* v. *Greer,* 9 Wall. 726, 732; *Xenia Bank* v. *Stewart,* 114 U. S. 224, 229; *Fidelity & Deposit Co.* v. *Courtney,* 186 U. S. 342, 349, 351; *Aetna Indemnity Co.* v. *Auto-Traction Co.,* 147 Fed. 95, 98; *Joslyn* v. *Cadillac Co.,*

177 Fed. 863, 865; *Chicago, Burlington & Quincy R. R. Co.* v. *Coleman,* 18 Ill. 297, 298.

The facts and circumstances disclosed by the record show clearly that the interest and influence of Fall as well as his official action were corruptly secured by Doheny for the making of the contracts and leases; that, after the executive order of May 31, 1921, Fall dominated the administration of the Naval Reserves, and that the consummation of the transaction was brought about by means of collusion and corrupt conspiracy between him and Doheny. Their purpose was to get for petitioners oil and gas leases covering all the unleased lands in the Reserve. The making of the contracts was a means to that end. The whole transaction was tainted with corruption. It was not necessary to show that the money transaction between Doheny and Fall constituted bribery as defined in the Criminal Code or that Fall was financially interested in the transaction or that the United States suffered or was liable to suffer any financial loss or disadvantage as a result of the contracts and leases. It is enough that these companies sought and corruptly obtained Fall's dominating influence in furtherance of the venture. It is clear that, at the instance of Doheny, Fall so favored the making of these contracts and leases that it was impossible for him loyally or faithfully to serve the interests of the United States. The lower courts for that reason rightly held the United States entitled to have them adjudged illegal and void. *Crocker* v. *United States,* 240 U. S. 74, 80, 81; *Garman* v. *United States,* 34 Ct. Cls. 237, 242; *Herman* v. *City of Oconto,* 100 Wis. 391, 399; *Harrington* v. *Victoria Graving Dock Co.,* L. R. 3 Q. B. D. 549; *Tool Company* v. *Norris,* 2 Wall. 45, 54, 56; *Trist* v. *Child,* 21 Wall. 441, 448, 452; *Meguire* v. *Corwine,* 101 U. S. 108, 111; *Oscanyan* v. *Arms Co.,* 103 U. S. 261, 275; *Washington Irr. Co.* v. *Krutz,* 119 Fed. 279, 286.

The transaction evidenced by the contracts and leases was not authorized by the Act of June 4, 1920. The grant of authority to the Secretary of the Navy did not indicate a change of policy as to conservation of the reserves. The Act of June 25, 1910, the Act of February 25, 1920, the executive orders, and the Joint Resolution of February 8, 1924, show that it has been and is the policy of the United States to maintain a great naval petroleum reserve in the ground. While the possibility of loss by drainage might be a reason for legislation enabling the Secretary to take any appropriate action that at any time might become necessary to save the petroleum, it is certain that the contracts and leases have no such purpose. The work to be paid for in crude products contemplated the construction of fuel depots. The one covered by the first contract was a complete unit sufficient for 1,500,000 barrels including pumping stations, fire protection and its own wharf and channel. It is not necessary to consider the possible extent of the construction that might be required under the later contract. Indeed it could not then be known how much work and products in storage it would take to exhaust the reserve. The record shows that the Navy Department estimated the cost of proposed storage plants and contents at approximately $103,000,000. Congress has not authorized any such program. The Department tried and failed to secure additional appropriations for the Pearl Harbor storage facilities. The Act of August 31, 1842, 5 Stat. 577 (R. S. § 1552), gave the Secretary authority to construct fuel depots. But it was taken away by the Act of March 4, 1913, 37 Stat. 898. Since that time Congress has made separate appropriations for fuel stations at places specifically named.[1] And it has

---

[1] March 4, 1913, c. 148, 37 Stat. 891, 898; June 30, 1914, c. 130, 38 Stat. 392, 401; March 3, 1915, c. 83, 38 Stat. 928, 937; August 29, 1916, c. 417, 39 Stat. 556, 570; March 4, 1917, c. 180, 39 Stat. 1168,

long been its policy to prohibit the making of contracts of purchase or for construction work in the absence of express authority and adequate appropriations therefor. R. S. §§ 3732, 3733; Act of June 12, 1906, 34 Stat. 255; Act of June 30, 1906, 34 Stat. 764. The Secretary was not authorized to use money received from the sale of gas products. All such sums are required to be paid into the Treasury. R. S. §§ 3617, 3618, as amended, 19 Stat. 249.

The words granting authority to the Secretary are " use, store, exchange, or sell " the oil and gas products. As the Secretary, among other things, was authorized until July 1, 1922, to use money out of the appropriation to " store " oil and gas products from these lands, it will not be held, in the absence of language clearly requiring it, that he was also empowered without limit to use crude oil to pay for additional storage facilities. Unless given him by " exchange " the Secretary had no power by such contracts to locate or construct fuel depots. It is not contended that the clause confers unlimited authority, and the petitioners say that the word " exchange " must have some reasonable limitation. But they insist that it is broad enough to authorize the contracts. If it is, there is no reason why crude oil may not be used to pay for any kind of construction work or to purchase any property that may be desired by the Department for the use of the Navy.

The purpose and scope of the provision are limited to the administration of the reserves. The clause is found in a proviso to an appropriation for an investigation of fuel adapted to naval requirements and the availability of the supply in the naval reserves. If " exchange " has

1179; June 15, 1917, c. 29, 40 Stat. 182, 207; July 1, 1918, c. 114, 40 Stat. 704, 726; November 4, 1918, c. 201, 40 Stat. 1020, 1034; July 11, 1919, c. 9, 41 Stat. 131, 145; June 5, 1920, c. 253, 41 Stat. 1015, 1030; July 12, 1921, c. 44, 42 Stat. 122, 130.

the meaning contended for by petitioners, it must be taken to indicate that Congress intended by the clause in question not only to restore to the Secretary authority in respect of fuel depots that had been taken from him by the Act of March 4, 1913, but also to enable him by means of contracts and leases such as these to reverse, if he saw fit, the established policy of the Government as to the petroleum reserves. The circumstances of the enactment as well as the terms of the provision indicate a purpose to authorize exchange of crude petroleum from these reserves for fuel oil and other petroleum products suitable for use by the Navy. The Secretary was not authorized to refine the crude product. A draft of the Act included that authority, but the word " refine " was stricken out. This made necessary the exchange of the crude product for fuel oil and other products suitable for use. Whatever the meaning rightly to be attributed to the words employed, it is clear that they stop short of authorizing the Secretary to pay for improvements such as were covered by the contracts.

The petitioners insist that, in any event, they are entitled to credit for the cost of construction work performed and of the fuel oil furnished at Pearl Harbor, and also for the amount they expended to drill and operate oil wells and to make other improvements on the leased lands.

The substance of the account, as stated in the decree of the District Court, is printed in the margin.[2] The

---

[2] A. Transport Company is debited:

1. All royalty oil, etc., delivered under contracts of
    April 25, 1922, and December 11, 1922, to May
    31, 1925 .................................... $7, 889, 759. 21
2. Profit on their resale ......................... 791, 012. 03
3. Interest on #1 ............................... 684, 625. 55
4. Interest on #2 ............................... 94, 351. 36

     Total ..................................... $9, 459, 748. 15

findings show that the storage facilities at Pearl Harbor covered by the contracts were economically completed on the lands of the United States under the direction of the companies and the supervision of officers of the Navy; that they are of benefit to the United States and are now available for use and should be retained by it; that the

---

B. Transport Company is credited:

1. Actual cost of storage facilities at Pearl Harbor, under contracts of April 25, 1922, and December 11, 1922.................................... $7,350,814.11
2. Interest on #1 ............................... 820,922.43
3. Cost of fuel oil delivered to tanks............. 1,986,142.47
4. Interest on #3 ............................... 259,569.11

Total.................................... $10,417,448.12

Balance due Transport Company.. $957,699.97

C. Petroleum Company is debited:

1. Value of petroleum products taken under leases of June 5, 1922, and December 11, 1922 (other than those included in the account of the Transport Co.) .................................. $1,556,861.17
2. Interest on #1 ............................... 170,650.02

Total.................................... $1,727,511.19

D. Petroleum Company is credited:

1. Actual cost of drilling, putting on production, maintaining and operating wells, and other useful improvements to property under leases.... $1,013,428.75
2. Actual cost of constructing, maintaining and operating compressor and absorption plant less value of use for products of other lands and less gasoline manufactured and sold from gas produced from lands in controversy.................... 194,991.01
3. Interest on #1 and #2....................... 161,060.43

Total.................................... $1,369,480.19

Balance due United States...... $358,031.00

NOTE: Interest is at the rate of 7% and is calculated on monthly balances to May 31, 1925.

Transport Company delivered into the storage constructed a specified quantity of fuel oil of value to the United States equal to what it cost the company; that under the supervision of Government officials the Petroleum Company economically expended money for development of the leased lands to produce oil, gas and gasoline and to make thereon permanent improvements that resulted in benefit to the United States equal to the amount expended.

They maintain that, as a condition of granting the United States the relief it claims, equity requires it to give credit to them for their expenditures; that if this be denied, they will be required to pay double the value of the royalty oil they have received, and that the United States thereby will be unjustly enriched; that, except the balance shown by the account, they have paid in full for such oil; that the United States has fully paid for the benefits it received from petitioner's expenditures, and that, in effect, it now seeks to recover the payments it made voluntarily. And they insist that the United States must be made to bear these amounts even if the contracts were made without authority of law or were tainted with fraud, violation of public policy, conspiracy or other wrongful act.

In suits brought by individuals for rescission of contracts the maxim that he who seeks equity must do equity is generally applied, so that the party against whom relief is sought shall be remitted to the position he occupied before the transaction complained of. " The court proceeds on the principle, that, as the transaction ought never to have taken place, the parties are to be placed as far as possible in the situation in which they would have stood if there had never been any such transaction." *Neblett* v. *Macfarland,* 92 U. S. 101, 103. And, while the perpetrator of the fraud has no standing to rescind, he is not regarded as an outlaw; and, if the trans-

action is rescinded by one who has the right to do so, "the courts will endeavor to do substantial justice so far as is consistent with adherence to law." *Stoffela* v. *Nugent,* 217 U. S. 499, 501. The general principles of equity are applicable in a suit by the United States to secure the cancelation of a conveyance or the rescission of a contract. *United States* v. *Detroit Lumber Co.,* 200 U. S. 321, 339; *United States* v. *Stinson,* 197 U. S. 200, 204; *State of Iowa* v. *Carr,* 191 Fed. 257, 266; cf. *Mason* v. *United States,* 260 U. S. 545, 557, *et seq.* But they will not be applied to frustrate the purpose of its laws or to thwart public policy.

*Causey* v. *United States,* 240 U. S. 399, was a suit in equity brought by the United States to recover title to public lands conveyed to defendant under the homestead laws. The patent was obtained by fraud. The defendant paid the United States for the land in scrip at the rate of $1.25 per acre. The complaint did not contain an offer to return the scrip, and it was insisted by the defendant that, because of such failure, the suit could not be maintained. The court said (p. 402): "This objection assumes that the suit is upon the same plane as if brought by an individual vendor to annul a sale of land fraudently induced. But, as this court has said, the Government in disposing of its public lands does not assume the attitude of a mere seller of real estate at its market value. These lands are held in trust for all the people, and in providing for their disposal Congress has sought to advance the interests of the whole country by opening them to entry in comparatively small tracts under restrictions designed to accomplish their settlement, development and utilization. And when a suit is brought to annul a patent obtained in violation of these restrictions, the purpose is not merely to regain the title but also to enforce a public statute and maintain the policy underlying it. Such a suit is not within the reason of the

ordinary rule that a vendor suing to annul a sale fraudulently induced must offer and be ready to return the consideration received.  That rule, if applied, would tend to frustrate the policy of the public land laws; and so it is held that the wrongdoer must restore the title unlawfully obtained and abide the judgment of Congress as to whether the consideration paid shall be refunded."

*Heckman* v. *United States,* 224 U. S. 413, was a suit by the United States to cancel conveyances of allotted lands made by members of the Cherokee Nation and to have the title decreed to be in the allottees and their heirs, upon the ground that the conveyances were made in violation of restrictions upon the power of alienation. On demurrer to the complaint it was insisted that the allottees had received considerations for the conveyances and should be made parties to the suit in order that equitable restoration might be enforced.  The court said (p. 446):  "Where, however, conveyance has been made in violation of the restrictions, it is plain that the return of the consideration cannot be regarded as an essential prerequisite to a decree of cancellation.  Otherwise, if the Indian grantor had squandered the money, he would lose the land which Congress intended he should hold, and the very incompetence and thriftlessness which were the occasion of the measures for his protection would render them of no avail.  The effectiveness of the acts of Congress is not thus to be destroyed.  The restrictions were set forth in public laws, and were matters of general knowledge.  Those who dealt with the Indians contrary to these provisions are not entitled to insist that they should keep the land if the purchase price is not repaid, and thus frustrate the policy of the statute."

*United States* v. *Trinidad Coal Co.,* 137 U. S. 160, was a suit brought by the United States to set aside patents conveying certain coal lands on the ground that they were obtained by fraud and in violation of R. S. §§ 2347,

2348, 2350. The company, in furtherance of a fraudulent scheme to get the lands, furnished the money that was paid to the United States by the fraudulent patentees who conveyed the lands to the company. The complaint did not contain an offer by the United States to return the money. The company contended that the United States was subject to the rules that apply to individuals and that relief should be conditioned upon return of the money. The court held that the rule should not be applied in a case like that one. It laid down and applied the principles on which rest the decisions in *Causey* v. *United States, supra,* and *Heckman* v. *United States, supra.* Among other things, the court said (p. 170): " If the defendant is entitled, upon a cancellation of the patents fraudulently and illegally obtained from the United States, in the name of others, for its benefit, to a return of the moneys furnished to its agents in order to procure such patents, we must assume that Congress will make an appropriation for that purpose, when it becomes necessary to do so. The proposition that the defendant, having violated a public statute in obtaining public-lands that were dedicated to other purposes, cannot be required to surrender them until it has been reimbursed the amount expended by it in procuring the legal title, is not within the reason of the ordinary rule that one who seeks equity must do equity; and, if sustained, would interfere with the prompt and efficient administration of the public domain. Let the wrongdoer first restore what it confesses to have obtained from the government by means of a fraudulent scheme formed by its officers, stockholders and employes in violation of law."

It was the purpose of those making the contracts and leases to circumvent the laws and defeat the policy of the United States established for the conservation of the naval petroleum reserves. The purpose of the representatives of the Department was to get for the Navy fuel

depots or storage facilities that had not been authorized by Congress. The leases were made to obtain the crude products for use as a substitute for money to make good the amounts advanced by petitioners to pay for such improvements. The Secretary's authority to provide facilities in which to " store " naval reserve petroleum or its products did not extend beyond those that might be provided by use of the money made available by the Act of June 4, 1920. And, in order to get control of the oil lands covered by the leases, the companies agreed to pay for these unauthorized works of construction and to furnish fuel oil and other products of petroleum suitable for naval use to fill the storage facilities so added. The contracts and leases and all that was done under them are so interwoven that they constitute a single transaction not authorized by law and consummated by conspiracy, corruption and fraud. The United States does not stand on the same footing as an individual in a suit to annul a deed or lease obtained from him by fraud. Its position is not that of a mere seller or lessor of land. The financial element in the transaction is not the sole or principal thing involved. This suit was brought to vindicate the policy of the Government, to preserve the integrity of the petroleum reserves and to devote them to the purposes for which they were created. The petitioners stand as wrongdoers, and no equity arises in their favor to prevent granting the relief sought by the United States. They may not insist on payment of the cost to them or the value to the Government of the improvements made or fuel oil furnished as all were done without authority and as means to circumvent the law and wrongfully to obtain the leases in question. As Congress had not authorized them, it must be assumed that the United States did not want the improvements made or was not ready to bear the cost of making them. No storage of fuel oil at Pearl Harbor was authorized to be made in excess of the

capacity of, or in any places other than, the facilities provided for that purpose pursuant to authorization by Congress. Whatever their usefulness or value, it is not for the courts to decide whether any of these things are needed or should be retained or used by the United States. Such questions are for the determination of Congress. It would be unjust to require the United States to account for them until Congress acts; and petitioners must abide its judgment in respect of the compensation, if any, to be made. And this applies to the claim on account of the fuel oil as well as to the other items. Clearly petitioners are in no better position than they would be if they had paid money to the United States, instead of putting the fuel oil in storage. Equity does not condition the relief here sought by the United States upon a return of the consideration. *United States* v. *Trinidad Coal Co., supra; Heckman* v. *United States, supra; Causey* v. *United States, supra.*

*Decree affirmed.*

MR. JUSTICE STONE took no part in the consideration or decision of this case.