Whitaker, Judge,
delivered the opinion of the court:
On February 18, 1941, a hill was introduced in the Senate directing the Secretary of the Treasury to pay to the Pan American Petroleum & Transport Company the sum of $9,336,956.58 as compensation for work and services rendered and material furnished by this company in connection with the construction of the naval fuel oil station at Pearl Harbor, Hawaii, and as compensation for the fuel oil and other petroleum products delivered by said company to the United States at said station in conformity with two contracts; one datejl April 25, 1922, and the other dated December 11, 1922. This bill was referred to this court “in pursuance of the provisions of an Act entitled, ‘An Act to codify, revise, and amend the laws relating to the judiciary,’ approved March 3, 1911,” known as the Judicial Code.
Section 151 of that Code authorizes reference to this court by either House of Congress of a bill pending before it for a report on the facts in the case and the amount justly due. In addition to making a report on the facts, the duty is also imposed on the court of reporting whether or not *116 there has been delay or laches in presenting the claim or whether or not it is barred by the statute of limitations, and to make such conclusions “as shall be sufficient to inform Congress of the nature and character of the demand, either as a claim, legal* or equitable, or as a gratuity against the United States, and the amount, if any, legally or equitably due from the United States to the claimant.”
After the passage of the Resolution referring to this court the bill “for the relief of the Pan American Petroleum and Transport Company,” that company filed a petition in this court setting up its claim. A general traverse was filed by the United States and the case was referred to a commissioner of the court to report on the facts.
All of the testimony introduced was embodied in a stipulation entered into between the parties, to which was attached numerous exhibits. The stipulation, however, was entered into, subject to the right in both parties to object to any of the facts stipulated “on the grounds of irrelevancy or immateriality, or both,” and the only issue between the parties is the question of what facts are relevant and material to the question presented by the bill “for the relief of the Pan American Petroleum and Transport Company.”
The plaintiff says that the only relevant and material facts are whether or not it constructed the naval fuel oil station at Pearl Harbor, and whether it delivered the fuel oil and other petroleum products as claimed, and whether or not the United States received the benefit of the work done and materials furnished and used them, and, lastly, whether or not the amount claimed for the work done and materials furnished is fair and equitable. This position, however, is clearly untenable in the light of the decision of the Supreme Court in the case of Pan American Petroleum & Transport Co., et al v. United States, 273 U. S. 456. Briefly stated, that case is as follows:
Not long befoi’e completion of the construction of the naval fuel oil station at Pearl Harbor, Congress passed a joint resolution on February 8,1924, reciting that the contracts of April 25, 1922, and of December 11, 1922, and the leases executed in pursuance of the contracts, had been executed *117 under circumstances indicating fraud and corruption and without authority on the part of the officers purporting to act for the United States, and in defiance of the settled policy of the Government to maintain in the ground a great reserve of oil adequate to the needs of the Navy; and the Act authorized and directed the President to cause suit to be prosecuted for the annulment and cancellation of all such leases and contracts.
In obedience thereto, a bill was filed in the District Court for the Southern District of California. The District Court entered a decree in accordance with the prayer of the bill and stated an account between the parties. This account, summarily stated, charged the Transport Company and the Petroleum Company, its subsidiary, with all the oil taken from the leased ground and credited these two companies with the cost of the erection of the storage facilities at Pearl Harbor and the oil delivered thereto, and the cost of drilling-wells on the leased ground.
On appeal by both parties to the Circuit Court of Appeals this decree was reversed insofar as it gave the two companies credit for the expenditures they had made.
The Supreme Court granted certiorari, and affirmed the decision of the Circuit Court of Appeals. The Supreme Court first held that the contracts and leases had been entered into as the result of fraud and corruption and without authority of law and contrary to the declared purpose of Congress. It then proceeded to consider whether or not the companies were entitled to credit for the expenditures that they had made in constructing the naval oil depot at Hawaii and in drilling wells, etc. The Supreme Court held that they were not entitled to this credit because, it said, “the contracts and leases and all that was done under them are so interwoven that they constitute a single transaction not authorized by law and consummated by conspiracy, corruption, and fraud.” (p. 509.)
The court recognized the rule that he who seeks equity must do equity requires a person defrauded to return, or offer to return, whatever of value he may have received as a result of the transaction, as a condition precedent to his *118 right to relief from the fraudulent transaction; but it held that this rule did not apply to the United States in such a case as was before it. The court said:
The United States does not stand on the same footing as an individual in a suit to annul a deed or lease obtained from him by fraud. Its position is not that of a mere seller or lessor of land. The financial element in the transaction is not the sole or principal thing involved. This suit was brought to vindicate the policy of the Government, to preserve the integrity of the petroleum reserves and to devote them to the purposes for which they were created. The petitioners stand as wrongdoers, and no equity arises in their favor to prevent granting the relief sought by the United States. They may not insist on payment of the cost to them or the value to the Government of the improvements made or fuel oil furnished as all were done without authority and as means to circumvent the law and wrongfully to obtain the leases in question. * * * [p. 509.]
The court then proceeded to say that it was “not for the courts to decide whether any of these things are needed or should be retained or used by the United States.” “Such questions,” it said, “are for the determination of Congress. It would be unjust to require the United States to account for them until Congress acts; and petitioners must abide its judgment in respect of the compensation, if any, to be made.”
It is apparent from the above quotations from the opinion of the Supreme Court that Congress should have before it all the facts relevant to the entire transaction, as a result of which the work was done and the materials were furnished, in order that it may arrive at an intelligent judgment as to whether or not the facts and circumstances transcend the ordinary considerations of equity and entitle plaintiff to relief notwithstanding its wrongdoing. With this guide in mind, the court makes the following
FINDINGS OF FACT
(For the convenience of the Congress, we incorporate in' the following findings certain things not ordinarily incorporated in judicial findings of fact, such as Acts of Congress and court decisions.)
*119 1. On February 18,1941, the following bill was introduced in the Senate of the United States:
A BILL
For the relief of the Pan American Petroleum and Transport Company.
Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That the Secretary of the Treasury be, and he is hereby, authorized and directed to pay, out of any money in the Treasury not otherwise appropriated, to the P’an American Petroleum and Transport Company the sum of $9,336,956.58, as compensation for work and services rendered and material furnished by the Pan American Petroleum and Transport Company for and in connection with the construction of the naval fuel oil station at Pearl Harbor, Territory of Hawaii, and compensation for the fuel oil and other petroleum products delivered by the Pan American Petroleum and Transport Company, to the United States of America at such station, in conformity with a contract dated April 25, 1922, supplemented by a contract dated December 11, 1922.
2. This bill was referred to this court under a Resolution* introduced in the Senate on March 10, 1941, reading as follows:
Resolved, That the bill (S. 905) entitled “A bill for the relief of the Pan American Petroleum and Transport. Company”, now pending in the Senate, together with all the accompanying papers, be, and the same is hereby, referred to the Court of Claims, in pursuance of the provisions of an Act entitled “An Act to codify, revise, and amend the laws relating to the judiciary,” approved March 3,1911; and the said court shall proceed with the same in accordance with the provisions of such Act and report to the Senate in accordance therewith.
3. Section 151 of the Judicial Code (Title 28 U. S. C., section 257), reads as follows:
Whenever any bill, except for a pension, is pending in either House of Congress providing for the payment of a claim against the United States, legal or equitable, or for a grant, gift, or bounty to any person, the House *120 in which such bill is pending may, for the investigation and determination of facts, refer the same to the Court of Claims, which shall proceed with the same in accordance wilh such rules as it may adopt and report to such House the facts in the case and the amount, where the same can be liquidated, including any facts bearing upon the question whether there has been delay or laches in presenting such claim or applying for such grant, gift, or bounty, and any facts bearing upon the question whether the bar of any statute of limitation should be removed or which shall be claimed to excuse the claimant for not having resorted to any established legal remedy, together with such conclusions as shall be sufficient to inform Congress of the nature and character o f the demand, either as a claim, legal or equitable, or as a gratuity against the United States, and the amount, if any, legally or equitably due from the United States to the claimant: Provided, however, That if it shall appear to the satisfaction of the court, upon the facts established, that under existing laws or the provisions of this chapter, the subject matter of the bill is such that it has jurisdiction to render judgment or decree thereon, it shall proceed to do so, giving to either party such further opportunity for hearing as in its judgment justice shall require, and it shall report its proceedings therein to the House of Congress by which the same was referred to said court. [March 3,1911, c. 231, § 151, 36 Stat. 1138.]
4. All the testimony introduced in this court is incorporated in a stipulation of facts entered into between the parties and filed on October 20, 1942. To this stipulation are attached exhibits A to P, both inclusive, and it incorporates by reference exhibits to plaintiff’s petition, Nos. 1 to 4, both inclusive. Paragraph 10 of the stipulation reads as follows:
A true copy of the opinion of the Supreme Court of the United States in the matter of United States v. Pan American Petroleum & Transport Company and Pan American Petroleum Company (273 U. S. 456) is attached hereto, marked “Exhibit I,” and made a part hereof. Each and all of the facts set out in said Exhibit I hereto are, as provided above in this stipulation, made a part of the record in this case; and each and all statements of fact and determinations of questions of law contained in said Exhibit I hereto, insofar as the same may here be applicable, are hereby conceded to be res judicata in this case.
*121 In view of this stipulation the following findings will be taken from the opinion of the Supreme Court insofar as possible, and where so taken they will be in quotations, with the reference to the page in the Supreme Court’s opinion where they are found.
5. The plaintiff, at all times mentioned in its petition, was a corporation duly organized and existing under and by virtue of the laws of the State of Delaware, with its principal office for the transaction of business in the City of New York and State of New York. It will hereafter be called the “Transport Company.” It owmed all the stock in the Pan American Petroleum Company, hereinafter called the “Petroleum Company.”
During the entire period of the negotiations and execution of the contracts and leases hereinafter referred to, Edward L. Dolicny controlled both companies. Until July 24, 1922, he was President of the Petroleum Company, but on that date became Chairman of its Board of Directors. Until December 7, 1928 he wTas President of the Transport Company, but on that date became Chairman of its Board of Directors.
6. On April 25, 1922, the plaintiff entered into a contract with the United States, signed by the Acting Secretary of the Interior and by the Secretary of the Navy providing for the construction of the storage facilities at Pearl Harbor and for the delivery to such storage facilities of 1,500,000 barrels of fuel oil. Later, a supplementary contract was entered into on December 11, 1922, signed for the United States by the Secretary of the Interior and the Secretary of the Navy, providing for the construction of additional storage facilities at Pearl Harbor and for the furnishing of additional fuel oil. It was under the first of these two contracts that the storage facilities were constructed and the oil was delivered, for which payment is now being requested.
The contract of April 25, 1922, called for payment for the work to be done and the oil to be furnished out of royalty oil to be obtained by the United States under leases to be given on lands located in Naval Petroleum Beserve No. 1, hereinafter mentioned. However, the contract did not obli *122 gate the United States to give such leases to the plaintiff; nevertheless, plaintiff’s proposal to construct the facilities and to furnish the oil was conditioned upon a preferential right to all oil leases which might thereafter be made by the Government in Naval Petroleum Reserve No. 1, and it insisted on such assurances. But instead of incorporating such a provision in the contract of April 25, 1922, it was agreed that a letter should be written by the Assistant Secretary of the Interior and the Secretary of the Navy to the plaintiff stating that the Department of the Interior had agreed to grant to the plaintiff within one year from the date of the delivery of the contract leases on two strips of land requested by plaintiff totalling 300 acres. Such a letter was written and such a lease was executed on June 5, 1922.
Later, and coincident with the signing of the contract of December 11, 1922, another lease was given the plaintiff covering the balance of the unleased lands in Naval Petroleum Reserve No. 1. -
7. By the terms of the contract dated April 25, 1922, as stated by the Supreme Court in the above-mentioned decision, on pages 488-489, “the Transport Company agreed to furnish at the Naval Station at Pearl Harbor, Hawaii, 1,500,000 barrels of fuel oil and deliver it into storage facilities there to be constructed by the company according to specifications of the Navy. The Company was to receive its compensation in crude oil to be taken from the Reserves. The quantity, on the basis of the posted field prices of crude oil prevailing during the life of the contract, was to be the equivalent of the market value of the fuel oil and also sufficient to cover the cost of the storage facilities. The United States agreed to deliver to the company at the place of production month by month all the royalty oil furnished by lessees in Reserve Nos. 1 and 2 until all claims under the contract were satisfied. It was stipulated that if production of crude oil should decrease so as unduly to prolong performance, ‘then the Government will, in the discretion of the Secretary of the Interior, grant additional leases on such lands as he may designate in naval petroleum reserve No. 1 as shall be sufficient to maintain total deliveries of *123 royalty oil under this contract at the approximate rate of five hundred thousand barrels (500,000) per annum.’ And, by Article XI of the contract, it was agreed that, if during the life of the contract such additional leases should be granted within specified area, ‘the contractor shall first be called upon by the Secretary of the Interior to meet such drilling conditions and to pay such royalties as the Secretary may deem just and proper, and in the event of his acceptance * * * the contractor shall be granted by the Government a preferential lease on such tracts as the Secretary of the Interior may decide to lease. In the event of the failure of the contractor to agree * * * then said lease or leases may be offered for competitive bidding, but the contractor shall have a right to submit a bid on equal terms with others engaged in said bidding.’ ”
8. “The lease of June 5,1922, was signed by the Assistant Secretary of the Interior. It was made in accordance with a letter of April 25,1922, signed by the Acting Secretary of the Interior and the Secretary of the Navy, and sent to J. J. Cotter, who was Vice-President of the Transport Company. It covered the quarter section described in the letter. This lease was assigned to the Petroleum Company.” (p. 489)
9. “The contract dated December 11, 1922, is signed for the United States by the Secretary of the Interior and the Secretary of the Navy. It declares that it is desired to fill storage tanks at Pearl Harbor promptly as they are completed and also to procure additional fuel oil and other petroleum products in storage there and elsewhere; that the Secretary of the Navy requested the Secretary of the Interior as administrator of the Naval Petroleum Eeserves to arrange for such products in storage and to exchange therefor additional royalty crude oil, ‘the probable cost of the additional products ,and storage immediately planned for being estimated at fifteen million dollars more or less’; that this cannot be done on the basis of exchange for the crude oil coming to the Government under the present leases; that, under the contract of April 25, 1922, the company is granted preferential right to leases to certain lands in Naval Reserve No. 1; and that the company was planning to provide refinery *124 facilities at Los Angeles, together with pipe lines from the field to the refinery and docks, and to erect storage having-capacity of 2,000,000 barrels or more. The company agreed to furnish, as directed by the Secretary of the Interior, the fuel oil in storage at Pearl Harbor covered by the earlier contract; to construct for actual cost additional storage facilities there, as required, up to 2,700,000 barrels; to furnish fuel oil and other petroleum products in the proposed storage as and when completed on the basis of market prices plus transportation cost at going rates; to furnish without charge, until expiration of the contract, storage for 1,000,000 barrels of fuel oil at Los Angeles; to fill it with fuel oil for the Navy at such time as Government royalty oil should be available for exchange, and to bunker Government ships from such oil at cost; to maintain for 15 years subject to the demands of the Navy 8,000,000 barrels of fuel oil in the company’s depots at Atlantic Coast points; to furnish crude oil products and storage facilities at other points, designated by the Government, when sufficient crude oil has been delivered to satisfy the Pearl Harbor contract; to sell the Navy at ten percent less than market price additional available fuel oil produced from the reserves and manufactured products from its California refineries; to credit the Navy for crude oil at published prices and for gas and casinghead gasoline at prices fixed in the leases, and to satisfy any surplus credits of the Government by delivery of fuel oil or other petroleum products, by construction of additional storage facilities, or by payment in cash as the Government might elect. The United States agreed to deliver to the company in exchange all royalty oil, gas, and casinghead gasoline produced on Reserves Nos. 1 and 2 until its obligations were discharged and in any event for fifteen years after the expiration of the contract of April 25, 1922 [which was without specified time limit], and to lease to the company all the unleased lands in Reserve No. 1.” (pp. 489-491.)
10. “The lease of December 11, 1922, is signed for the United States by the Secretary of the Interior and the Secretary of the Navy. It covers all unleased lands in Reserve No. 1, but with a provision that no drilling shall be done on *125 approximately the western half without the lessor’s consent. It runs for twenty years and so long thereafter as oil or gas is produced in paying quantities. The royalties range from 12y2 to 35 per cent.” (p. 491)
These contracts and leases were executed in the face of the declared policy of Congress, set out in the following three findings, as stated in the decision of the Supreme Court in Pan American Co. et al v. United States, sufra.
11. “Under B. S. sections 2319, 2329, and the Act of February 11,1897, c. 216,29 Stat. 526, public lands containing oil were open to settlement, exploration and purchase. Exploration and location were permitted without charge, and title could be obtained for a nominal amount. * * * Prior to the autumn of 1909 large areas of public land in California were explored; petroleum was found, patents were obtained, and large quantities of oil were taken. In September of that year, the director of the Geological Survey reported that, at the rate oil lands in California were being patented, all would be taken within a few months, and that, in view of the increased use of fuel oil by the Navy, there appeared to be immediate need for conservation. Then the President, without specific authorization of Congress, by proclamation withdrew from disposition in any manner specified areas of public lands in California and Wyoming amounting to 3,041,000 acres. By the Act of June 25, 1910, c. 421 (36 Stat. 847), Congress expressly authorized the President to withdraw public lands containing oil, gas and other minerals. An executive order of July 2, 1910, confirmed the withdrawals then in force. By a later order, September 2, 1912, the President directed that some of these lands “constitute Naval Petroleum Keserve No. 1 and shall be held for the exclusive use or benefit of the United States Navy until this order is revoked by the President or by Act of Congress.” (pp. 486-487.) This reserve includes all the lands involved in the leases above mentioned. By a similar order, dated December 13, 1912, the President created Naval Petroleum Eeserve No. 2.
12. “The Leasing Act of February 25, 1920, c. 85, 41 Stat. 437, regulates the exploration and mining of public lands, *126 and authorizes the Secretary of the Interior to grant permits for exploration and make leases covering oil and gas lands, exclusive of those withdrawn or reserved for military or naval purposes. The Act of June 4,1920, c. 228, 41 Stat. 812, 818, appropriated $30,000 to be used, among other things, for investigating fuel for the Navy and the availability of the supply allowed by naval reserves in the public domain. It contains the following: ‘ProvidedThat the Secretary of the Navy is directed to take possession of all properties within the naval petroleum reserves * * * to conserve, develop, use, and operate the same in his discretion, directly or by contract, lease, or otherwise, and to use, store, exchange, or sell the oil and gas products thereof, and those from all royalty oil from lands in the naval reserves, for the benefit of the United States: * * * And 'provided further, That such sums as have been or may be turned into the Treasury of the United States from royalties on lands within the naval petroleum reserves prior to July 1, 1921, not to exceed $500,-000, are hereby made available for this purpose until July 1, 1922: Provided further, That this appropriation shall be reimbursed from the proper appropriations on account of the oil and gas products from said properties used by the United States at such rate, not in excess of the market value of the oil, as the Secretary of the Navy may direct.’ ” (pp. 487-488.)
13. Under the Act of August 31, 1842 (5 Stat. 577; R. S. § 1552), the Secretary was authorized to construct fuel oil depots, but such authority was taken away from him by the Act of March 4,1913 ( 37 Stat. 898). Since that time Congress has made separate appropriations for fuel oil stations at places specifically named.[1] “And,” as said by the Supreme Court on page 501 of the above mentioned opinion, “it has long been its policy to prohibit the making of contracts of purchase or for construction work in the absence of express *127 authority and adequate appropriations therefor. E. S. secs. 3782, 3733; Act of June 12, 1906, 34 Stat. 255; Act of June 30, 1906, 34 Stat. 764.” Prior to the execution of the contracts above referred to the Department had tried to secure additional appropriations for the Pearl Harbor storage facilities, but Congress had refused to make them.
The contract of April 25, 1922, as stated, called for payment for the construction of these storage facilities out of royalty oil to be secured from the execution of leases on lands in naval petroleum reserves, but, as stated by the Supreme Court: “The Secretary was not authorized to use money received from the sale of gas products. All such sums are required to be paid into the Treasury. R. S. secs. 3617, 3618, as amended, 19 Stat. 249” (p. 502).
14. “March 5, 1921, Edwin Denby became Secretary of the Navy and Albert B. Fall, Secretary of the Interior. May 31, 1921, the President promulgated an executive order purporting to commit the administration and conservation of all oil and gas bearing lands in the Eeserves to the Secretary of the Interior, subject to the supervision of the President” (p. 488).
15. “A Joint Eesolution adopted'by the Senate and House of Eepresentatives and approved by the President, February 8, 1924, 43 Stat. 5, stated that it appeared from evidence taken by the Committee on Public Lands and Surveys of the Senate that the contract of April 25,1922, and the lease of December 11, 1922, were executed under circumstances indicating fraud and corruption, without authority on the part of the officers purporting to act for the United States and in defiance of the settled policy of the Government to maintain in the ground a great reserve supply of oil adequate to the needs of the Navy. It declared the contracts and leases to be against public interest and that the lands should be recovered and held for the purposes to which they were dedicated. And it authorized and directed the President to cause suit to be prosecuted for the annulment and cancellation of the lease and all contracts incidental and supplementary thereto, and to prosecute such other action or *128 proceedings, civil and criminal, as might be warranted” (pp. 491-492).
16. Pursuant to this resolution, the President appointed the Honorable Owen J. Roberts and the Honorable Atlee Pomerene as special counsel for the United States, who, under the authority conferred upon them, instituted suit on March 17,1924, against the plaintiff herein and its subsidiary, the Petroleum Company, in the District Court for the Southern District of California, for the recovery of the lands described in the leases dated June 5 and December 11, 1922, for the cancellation of the said leases and the two contracts dated April 25 and December 11,1922, and for an accounting. The opinion of the District Court was handed down May 28, 1925 (6 F. (2d) 43). The court entered its decree on July 11, 1925. The court cancelled the leases and contracts on the ground that they were consummated between Fall and Doheny by conspiracy, corruption, and fraud, and on the further ground that the contracts and leases were not authorized by law. The court in the decree ordered the Transport Company to deliver to the United States the contracts of April 25 and December 11,1922, and the Petroleum Company to deliver to the United States the leases of June 5 and, December 11,1922 — all of the foregoing to be cancelled.
The court in the decree made an accounting as follows:
I. THE TRANSPORT COMPANY
The Transport Company was debited with—
1. All royalty oil delivered under the two contracts_$7, 889,759.21
2. Profit on resale of royalty oil_ 791, 012.03
3. Interest on the foregoing items_ 778, 976. 91
Total_ 9,459, 748.15
The Transport Company was credited with—
1. Actual cost of storage facilities at Pearl Harbor_ 7, 350, 814.11
2. Actual cost of fuel oil delivered in said facilities_ 1, 986,142.47
3. Interest on the foregoing items_ 1, 080, 491. 54
Total_ 10,417,448.12
Balance due the Transport Company. 957, 699. 97
*129 II. THE PETROLEUM COMPANY
The Petroleum Company was debited with—
1. Value of oil (not including above) taken under the two leases_$1, 556, 861.17
2. Interest on above item_ 170,650. 02
Total_ 1, 727, 511.19
The Petroleum Company was credited with—
1. Actual expenditures in drilling, making useful improvements, etc., to property under the leases- 1,013, 428. 75
2. Other actual expenditures on said property_ 194, 991.01
3. Interest on the foregoing items_ 161,060. 43
Total___ 1, 369,480.19
Balance due the United States_ 358, 031.00
The court in the decree directed the receivers, who were appointed to take charge of the properties at the time the suit was instituted, to pay to the Transport Company the sum of $957,699.97, with interest. The court directed the Petroleum Company to pay to the United States the sum of $358,031.00, with interest.
17. The District Court found the following facts, as stated in abridged form by the Supreme Court in the above mentioned case:
“(a) E. L. Doheny controlled both companies. Fall was active in procuring the transfer of the administration of naval petroleum reserves from the Navy Department to the Interior. And, after the executive order was made, he dominated the negotiations that eventuated in the contracts and leases. From the inception no matter of policy or action of importance was determined without Ms consent. Denby was passive throughout, and signed the contracts and lease and the letter of April 25, 1922, under misappprehension and without full knowledge of their contents. July 8,1921, Fall wrote Doheny: ‘There will be no possibility of any further conflict with Navy officials and this Department, as I have notified Secretary Denby that I should conduct the matter of naval leases under the direction of the President, without calling any of his force in consultation unless I conferred *130 with himself personally upon a matter of policy. He understands the situation and that I shall handle matters exactly as I think best and will not consult with any officials of any bureau in his Department, but only with himself, and such consultation will be confined strictly and entirely to matters of general policy.’ After that Doheny and his companies acted upon the belief that Fall had authority to make the contracts and leases. Doheny and Fall conferred as to a proposal to be made by the Transport Company whereby it should receive from the United States royalty oil for constructing storage facilities at Pearl Harbor and filling them with fuel oil. They discussed the matter of granting other leases in Reserve No. 1. They also discussed a petition of the Petroleum Company for reduction of royalties under an existing lease. Fall and Admiral John K. Robison, personal representative of the Secretary of the Navy in naval reserve matters, agreed that the proposed contract should be kept secret so that Congress and the public should not know what was being done. [But it is to be said that Robison’s motives in this were not the same as Fall’s.]” (pp. 492-493)
(b) “November 28, 1921, Doheny submitted to Fall a proposal stating that, in accordance with a suggestion from Fall, he had made inquiries as to cost of constructing storage for 1,500,000 barrels of fuel oil at Pearl Harbor. He gave in detail figures relating to such cost, the price of crude oil in the field and of fuel oil at Pearl Harbor, and stated the total amount of crude oil necessary to pay for the tanks and fuel oil ‘on the basis of our being paid for both tanks and oil in royalty crude oil produced from lands within the naval reserves and to be leased to us.’ The letter concluded: ‘I suppose you will turn this matter over to First Assistant Secretary Finney, who, with Rear Admiral Robison, may arrange the details of it during your absence, and as I also expect to be absent, I am confidentially furnishing Mr. Cotter with the information so that he can intelligently discuss the matter with Mr. Finnejn’ And the next day Fall wrote Robison: ‘Mr. Cotter will wait upon you with data, etc., with relation to oil tanks and royalty oils in connection with Pearl Harbor demands. I have asked him also to hand you, for your inspection, the original of a letter from Colonel *131 Doheny addressed to myself, containing a resume of the data. Should you think best to accept this proposition then of course it would be necessary, in my judgment, to turn oyer to Col. Doheny, if we can do so, leases upon further wells or area in’the naval reserve in which he is now drilling. If this is done it must be understood that the royalty must be made less than are the present royalties being paid by the Midway and Pan American.’ The letter stated that the gas pressure was lessening and that the companies were suffering loss in the payment of the 55 percent royalty. ‘If you approve the proposition, will you kindly indicate to me such approval by simple endorsement upon Col. Doheny’s letter to myself, signed by yourself. Your simple O. K. will be sufficient.’ ” (pp. 493-494)
(c) “Doheny had agreed-ito advance $100,000 to Fall as and when he should need it. November 30, at Fall’s request, Doheny sent him $100,000 in currency. The money was obtained in New York on the check of Doheny’s son who carried it to Washington and gave it to Fall. And Fall sent to Doheny by the son a demand note for $100,000. No entry of the advance was made in the accounts of Doheny or the petitioners. Nothing has been paid on account of principal or interest. At that time it was understood between Doheny and Fall that the latter need not repay it in kind. Doheny intended, if Fall did not dispose of a certain ranch in New Mexico, to cause the Transport Company to employ him at a salary sufficient to enable him, out of one-half of it, to pay off the amount in five or six years; and he knew that Fall expected to leave the service of the Government and accept employment with one of his companies. A few weeks after it was given, Doheny tore Fall’s signature off the note so that it would not be enforceable in the hands of others. December 1, Fall gave instructions to subordinates that the petition of the Petroleum Company for reduction of royalties should not be granted but that, as relief, the company be given another lease at regulation royalties.” (p. 494)
(d) “Long in advance of receipt of bids Fall knew that the Transport Company would offer to construct storage facilities at cost and to fill them with fuel oil in exchange for royalty oil and for the assurance that other leases on *132 lands in Reserve No. 1 would be granted to it. Others were not advised that the United States would consider a bid conditioned on assurance to the bidder of other leases or preferential right to leases. Due to the interest of Fall, the Transport Company had opportunities for coriference with and advice frpm those acting for the United States which were not given to others. There were five other oil companies with which officers or employees of the United States conferred as to the proposed contract. Fall knew that two of these would not bid because they considered the proposed contract illegal; that two of the others had not been invited to bid, and that the other one would refuse to bid unless authority fot the contract should be obtained from Congress. Invitation for proposals was sent two construction companies; but Fall understood and stated that it was impossible for either of them to bid because payment had to be made in royalty oil. April 18, Fall left Washington for Three Rivers, New Mexico. Before leaving he gave instructions that no bids should be accepted or contract awarded without his consent. The bids were opened April 15. Four were received; one was conditioned upon Congressional approval of the contract; one did not cover the construction work and applied only to furnishing the fuel oil; the other two proposals were from the Transport Company: one of them, designated A, was in accordance with the invitation for bids, but the other, called B, was not. The latter named the smaller lump sum in barrels of crude oil; it stated that if actual cost was less than a specified amount the saving should be credited to the Government; and it was conditioned upon granting the bidder preferential right to become lessee in all leases that thereafter might be granted by the United States for recovery of oil and gas in Reserve No. 1. On April 18, Edward C. Finney, Acting Secretary of the Interior, telegraphed Fall that certain officials and employees of the United States recommended acceptance of proposal B; on the same day Fall consented by telegram, and Finney sent a letter to the company purporting to award the contract to it. Cotter then stated that the Transport Company did not desire to make the contract unless the United States would agree, within twelve months, to grant the company a *133 lease or leases of lands in Reserve No. 1. He also raised'tlie question whether the executive order of May 31, 1921, had any legal force and refused to permit the company to make the contract unless Denby should sign as Secretary of the Navy. April 20, Arthur W. Ambrose of the Bureau of Mines was sent from Washington to Three Rivers with the papers in the case. He was instructed to consult Fall as to whether Denby should be made a party to the contract. April 23, Fall by telegram agreed that Denby should be made a party and directed Finney to execute the contract for the Department of the Interior. While it is not clearly shown that Ambrose took with him a draft of the letter of April 25, signed by Denby and Finney and sent to Cotter, he was instructed to, and did, consult Fall concerning it. That letter declares that the company’s proposals were the lowest received by the Government. After stating that, expressed in money, proposal B is the better by $235,184.40, and by the possible saving by performance for less than the estimated cost of construction, it said: ‘It is evident from our conversation of April 18 that your interpretation of preferential right was to the effect that the . . . Transport Co.^ desired the right to lease certain specified land in naval petroleum reserve No. 1 as well as preferential right to lease other land in naval petroleum reserve No. 1 to the extent described in Article XI of contract. It is also my understanding from your conversation that unless the . . . Transport Co. could get a lease to certain lands, your company would not desire to enter into a contract under the terms outlined in proposal (B) and preferred the government would accept proposal (A).’ The letter then stated that the Department favored proposal B and reiterated its stated advantages over the other proposal. Then it said: ‘In order that the Government may take advantage of a contract embodying the terms outlined in proposal (B), I wish to advise 3’ou that the Department of the Interior will agree to grant to the . . . Transport Co. within one year from the date of the delivery of a contract relative to the Pearl Harbor project leases to drill the following tracts or land.’ The letter specified the quarter section covered by the lease of June 5, 1922, and an additional strip, and stated that the *134 royalties to be required would not be greater than specified rates ranging from 1214 to 35 percent. The preferential right was inserted to prevent competition. The assurance that additional leases would be given was not necessary or required under proposal B.
“After the making of the contract of April 25, the posted field price of crude oil declined rapidly. In the autumn of 1922 the Transport Company and Doheny were in correspondence or consultation with Fall for the purpose of at once securing additional leases in Keserve No. 1. Doheny submitted a proposition to Fall which the latter delivered to his subordinates with his favorable recommendation. Later Doheny enlarged the proposition, and there followed negotiations concerning the proposed lease. Doheny and Fall agreed upon a schedule of royalties. The lease of December 11 was arranged without competition of any kind. Plans for the proposed construction work had not been prepared. Before the contract and lease were made Fall and others in his Department stated to persons making inquiries that it was not the intention to make leases or to drill in that Reserve. The danger of drainage had been eliminated by agreement between the United States and oil companies operating in the vicinity that no drilling should be done by either except on six months’ notice to the other.” (pp. 49A-497.)
18. An appeal was taken by both sides from the decree of the District Court to the Circuit Court of Appeals, which, on January 4, 1926, in an opinion reported in 9 F. (2d) 761, affirmed in part and reversed in part the decree of the lower court. The last paragraph of this opinion reads as follows:
The decree of the court below, so far as it awards affirmative relief to the United States in ordering the cancellation of the leases and contracts, and commands the defendants to surrender possession of the lands mentioned in the bill of complaint, and enjoins them against trespassing thereon or removing property therefrom, is affirmed. That portion of the decree which directs that the defendants be credited with the cost price of the storage facilities for crude oil products at Pearl Harbor and the cost price of the fuel oil contents thereof and the actual expenditures of money in drilling and *135 putting on production any wells drilled under the leases is reversed, and the cause is remanded to the court below for further proceedings in accordance with the foregoing opinion.
With reference to the findings of fact by the District Court the Circuit Court of Appeals said (p. 768) :
* * * We find no ground for disturbing the findings of fact, which we deem essential to the decision of the case, and, while the evidence may be insufficient to support certain contested findings, the disputed facts, in view of our conclusions upon the law applicable to the case, become of little importance.
19. In the Supreme Court the plaintiffs argued, as stated by the Supreme Court (p. 498), “that the Secretary of the Navy did in fact exert the authority conferred by the Act of June 4, 1920, and that Fall did not dominate the making of the contracts and leases; that it was not proved by any evidence competent or admissible against the companies that Doheny gave Fall $100,000; that the giving of the money did not affect the transaction; that it was a loan and not a bribe, and that the record does not sustain the conclusion of the District Court.”
Of this argument the Supreme Court said: “We have considered the evidence, and we are satisfied that the findings as to the matters of fact here controverted are fully sustained, except the statement that Denby signed the contracts and leases under misapprehension and without full knowledge of the contents of the documents. As to that the record requires an opposite finding. Under the Act of June 4,1920, it was his official duty to administer the oil reserves; he was not called as a witness, and it is not to be assumed that he was without knowledge of the disposition to be made of them or of the means employed to get storage facilities and fuel oil for the Navy. He is presumed to have had knowledge of what he signed; there are direct evidence and proven circumstances to show that he had. But the evidence sustains the finding that he took no active part in the negotiations, and that Fall, acting collusively with Doheny, dominated the making of 1 he contracts and leases. The finding that Doheny caused the $100,000 to be given to Fall is adequately sustained by the evidence.” (p. 498)
*136 “The facts and circumstances disclosed by the record show clearly that the interest and influence of Fall as well as his official action were corruptly secured by Doheny for the making of the contracts and leases; that, after the executive order of May 31,1921, Fall dominated the administration of the Naval Reserves, and that the consummation of the transaction was brought about by means of collusion and corrupt conspiracy between him and Doheny. Their purpose was to get for petitioners oil and gas leases covering all the un-' leased lands in the Reserve. The making of the contracts was a means to that end. The whole transaction was tainted with corruption. It was not necessary to show that the money transaction between Doheny and Fall constituted bribery as defined in the Criminal Code or that Fall was financially interested in the transaction or that the United States suffered or was liable to suffer any financial loss or disadvantage as a result of the contracts and leases. It is enough that these companies sought and corruptly obtained Fall’s dominating influence in furtherance of the venture. It is clear that, at the instance of Doheny, Fall so favored the making of these contracts and leases that it was impossible for him loyally or faithfully to serve the interests of the United States. The lower courts for that reason rightly held the United States entitled to have them adjudged illegal and void.” (p. 500.)
20. As stated in the foregoing finding, the Supreme Court declined to decide whether or not the transaction between Doheny and Fall constituted bribery as defined in the Criminal Code, but Fall was indicted for bribery in the Supreme Court of the District of Columbia and was convicted, his conviction was affirmed by the Court of Appeals of the District of Columbia (49 F. (2d) 506), and certiorari was denied by the Supreme Court. (Fall v. United States, 283 U. S. 867.)
21. On the question of plaintiff’s right to a credit for its expenditures in the construction of the storage facilities and of the Petroleum Company’s right to a credit for its expenditures in drilling, etc., the court said: “In suits brought by individuals for rescission of contracts the maxim that he who seeks equity must do equity is generally applied, so that *137 the party against whom relief is sought shall be remitted to the position he occupied before the transaction complained of. ‘The court proceeds on the principle, that, as the transaction ought never to have taken place, the parties are to be placed as far as possible in the situation in which they would have stood if there had never been any such transaction.’ Neblett v. Macfarland, 92 U. S. 101, 103. And, while the perpetrator of the fraud has no standing to rescind, he is not regarded as an outlaw; and, if the transaction is rescinded by one who has the right to do so, ‘the courts will endeavor to do substantial justice so far as is consistent with adherence to law.’ Stoffela v. Nugent, 217 U. S. 499, 501. The general principles of equity are applicable in a suit by the United States to secure the cancelation of a conveyance or the rescission of a contract. United States v. Detroit Lumber Co., 200 U. S. 321, 339; United States v. Stinson, 197 U. S. 200, 204; State of Iowa v. Carr, 191 Fed. 257, 266; cf. Mason v. United States, 260 U. S. 545, 557, et seq. But they will not be applied to frustrate the purpose of its laws or to thwart public policy.” (pp. 505-506.)
The court then discussed several cases holding the United States was not under the obligation to return any benefits it had received under a fraudulent transaction entered into to circumvent its laws, and concluded: “It was the purpose of those making the contracts and leases to circumvent the laws and defeat the policy of the United States established for the conservation of the naval petroleum reserves. The purpose of the representatives of the Department was to get for the Navy fuel depots or storage facilities that had not been authorized by Congress. The leases were made to obtain the crude products for use as a substitute for money to make good the amounts advanced by petitioners to pay for such improvements. The Secretary’s authority to provide facilities in which to ‘store’ naval reserve petroleum or its products did not extend beyond those that might be provided by use of the money made available by the Act of June 4, 1920. And, in order to get control of the oil lands covered by the leases, the companies agreed to pay for these unauthorized works of construction and to furnish fuel oil and other products of petroleum suitable for naval use to fill the storage *138 facilities so added. The contracts and leases and all that was done under them are so interwoven that they constitute a single transaction not authorized by law and consummated by conspiracy, corruption, and fraud. The United States does not stand on the same footing as an individual in a suit to annul a deed or lease obtained from him by fraud. Its position is not that of a mere seller or lessor of land. The financial element in the transaction is not the sole or principal thing involved. This suit was brought to vindicate the policy of the Government, to preserve the integrity of the petroleum reserves and to devote them to the purposes for which they were created. The petitioners stand as wrongdoers, and no equity arises in their favor to prevent granting the relief sought by the United States. They may not insist on payment of the cost to them or the value to the Government of the improvements made or fuel oil furnished as all were done without authority and as means to circumvent the law and wrongfully to obtain the leases in question. As Congress had not 'authorized them, it must be assumed that the United States did not want the improvements made or was not ready to bear the cost of making them. No storage of fuel oil at Pearl Harbor was authorized to be made in excess of the capacity of, or in any places other than, the facilities provided for that purpose pursuant to authorization by Congress. Whatever their usefulness or value, it is not for the courts to decide whether any of these things are needed or should be retained or used by the United States. Such questions are for the determination of Congress. It would be unjust to require the United States to account for them until Congress acts; and petitioners must abide its judgment in respect of the compensation, if any, to be made. And this applies to the claim on account of the fuel oil as well as to the other items. Clearly petitioners are in no better position than they would be if they had paid money to the United States, instead of putting the fuel oil in storage. Equity does not condition the relief here sought by the United States upon a return of the consideration.” (pp. 508-510.)
22. Upon remand of the case to the District Court that court entered its decree directing the plaintiff to pay to the *139 United States the sums debited in finding 16, with some additional items and interest, which, in the amount of $11,092,264.82, were paid September 6, 1927; and the Petroleum Company was directed to pay to the United States the sums debited in finding 16, with additional interest, which were also duly paid.
23. All expenditures on account of construction work performed at Pearl Harbor, Hawaii, pursuant to the contracts of April 25 and December 11, 1922, were duly certified by Naval officers on the job at Pearl Harbor and by Admiral Gregory, Chief of the Bureau of Yards and Docks, Navy Department.
The actual cost to the plaintiff of constructing the storage facilities at Pearl Harbor in pursuance of the two contracts of April 25 and December 11, 1922, was $7,350,814.11; and the actual cost to the plaintiff of the 1,453,275 barrels of fuel oil furnished pursuant to the terms of the said two contracts and delivered into the storage facilities thus constructed at Pearl Harbor was $1,986,142.47, making a total of $9,336,956.58.
The plaintiff duly performed all terms and conditions of the contracts dated April 25 and December 11, 1922, on its part to be performed at P’earl Harbor, and prior to the date of the original decree of the District Court had completed all work and supplied the fuel oil as required by the terms of said contracts.
The United States, by the Navy Department, has been in full charge and control of the aforesaid storage facilities constructed and fuel oil furnished by the plaintiff at Pearl Harbor pursuant to the contracts dated April 25 and December 11, 1922, from the date of the Supreme Court’s decision to the present time, and has been using them.
24. At the time the suit to cancel the contracts and leases was started on March 17,1924, the storage facilities at Pearl Harbor had not been completed, and on account of the imminence of the suit plaintiff was about to stop the work. To prevent this Doheny wrote plaintiff on March 10, 1924, in which he agreed to save it harmless from any loss on account of further work to be done, if plaintiff would complete construction of the facilities. The work was completed *140 pursuant to this agreement and a stipulation between counsel for the parties in the suit to cancel the contracts and leases, dated April 14, 1924.
The cost of completion after the date of Doheny’s letter was $1,284,194.10. This sum was paid plaintiff by Doheny. It is a part of the $9,336,956.58 now being claimed by plaintiff.
25. In August 1928 one of plaintiff’s stockholders commenced a suit against Doheny to recover the sums expended by plaintiff for the construction work done and the fuel oil furnished at Pearl Harbor. This suit was settled on June 10,1930, by the payment to plaintiff by Doheny of the sum of $2,700,000. This sum is also included in the amount now being claimed by plaintiff.
26. On June 10, 1933, plaintiff entered into an agreement with Doheny, whereby it promised to refund to him the $1,284,194.10 and the $2,700,000, if it was able to secure from Congress an appropriation for the cost of constructing the storage facilities and furnishing the fuel oil at Pearl Harbor amounting to $9,336,956.58. Plaintiff also agreed that if it secured from Congress any sum in excess of the net cost to it of the construction of these facilities and the furnishing of this fuel oil, it would turn over such excess to Doheny. By “net cost” is meant the difference between the total cost of $9,336,956.58 and the $3,984,194.10 paid to plaintiff by Doheny.
27. The foregoing are the facts relative to the suits instituted to cancel the contracts under which the storage facilities were constructed and the fuel oil was furnished, for which payment is now being requested. But the following facts are pertinent to a consideration by Congress of plaintiff’s request for the cost of the construction of these facilities and the furnishing of this oil.
28. In addition to the leases of June 5, 1922, and December 11, 1922, entered into with plaintiff, the Assistant Secretary of the Interior also executed three other leases to plaintiff’s subsidiary, the Petroleum Company, two dated December 14,1921, and one dated February 8,1922, covering oil lands in Naval Petroleum Reserve No. 1. Suit was brought in the District Court for the Southern Division of *141 California to cancel these leases on the ground that they also had been fraudulently and corruptly entered into and without authority of and in defiance of the established policy of Congress.
The disposition of the suit was deferred to await final determination of the suit to cancel the contracts of April 25, 1922 and December 11, 1922, and the leases issued in pursuance thereto. After this case had been finally decided, the trial of the suit involving the three above-mentioned leases was begun. The District Court held that only one of the leases should be declared void on account of the dealings between Fall and Doheny, but denied the United States any relief at all because, it held, the Government should have prayed for relief from these three leases in the same suit in which it had asked cancellation of the contracts of April 25, 1922 and December 11, 1922, and the leases issued pursuant thereto.
The Circuit Court of Appeals reversed the District Court, and held (55 F. (2d) 753, 771), “these three leases were vitiated by the same fraud that was condemned by the Supreme Court in the first case [United States v. Pan American Transport and Petroleum Company, 273 U. S. 456]. "We find nothing in the record to purge them of that fraud.” The case ivas remanded to the District Court with instructions to enter a decree in accordance with the prayer of the amended bill.
Upon remand the District Court, on January 14, 1933, entered a decree cancelling the leases, and awarded the United States a judgment against the Petroleum Company in the sum of $9,277,666.17, the value of the oil and oil products extracted under the said three leases, with interest. No credit was given for the expense of drilling, etc., nor does it appear from the record before us what were these amounts.
The judgment awarded has not been fully paid. As of July 1, 1942, the unpaid balance of the principal of the judgment was $2,780,587.41, and on that date there had accumulated interest in the amount of $981,257.70.
At the time of the execution of these leases the plaintiff herein owned and controlled all of the stock of the Petro *142 leum Company, as heretofore stated, but on January 1,1925, it disposed of its interest in this company.
29. By May 12, 1925, E. L. Doheny and his family had disposed of all their stock in the plaintiff. On June 30, 1941, The Standard Oil Co. (Indiana) owned 3,697,612 shares of the common stock of that company out of a total of 4,702,944.5655 shares.
The control and majority ownership of the plaintiff was acquired by the Standard Oil Co. by a number of transactions beginning about the first of April 1925.
On March 27, 1925, the Pan American Eastern Petroleum Corp. was organized to acquire control of plaintiff. By May 12, 1925, it had acquired 501,000 shares of its common stock out of a total of 1,001,557 shares, giving it the desired control. In turn the Standard Oil Co. had acquired control of Pan American Eastern Petroleum Corp. by May 23, 1927. It acquired 257,778 shares on May 19,1927, and 32,222 shares on May 23, 1927, out of a total of 550,000 shares.
Both dates were after the Supreme Court’s decision above quoted from.
By December 31,1927, the Standard Oil Co.’s holdings had been increased to 440,000 shares.
By December 31, 1929, the Pan American Eastern Petroleum Corp. had apparently been dissolved. At any rate, on that date the Standard Oil Co.’s ownership of plaintiff was direct and not through the medium of the Pan American Eastern Petroleum Corp. The Standard Oil Co. then owned 908,852 shares of plaintiff’s common stock out of a total of 999,958.248 shares, and owned 1,784,254 shares of its Class B common stock out of a total of 2,360,740.5333 shares.
30. On the question of delay or laches the facts are: The Supreme Court’s decision was rendered February 28, 1927. The bill for the relief of the plaintiff was introduced in Congress February 18, 1941, about 14 years later. The record does not disclose whether the plaintiff in the meantime had made any effort to secure the introduction of such a bill.
In accordance with the provisions of section 151 of the Judicial Code (U. S. Code, Title 28, section 257) the court stated its conclusions, as follows:
*143 1. The plaintiff lias no claim against the United States either at law or in equity.
2. The United States has received and retains the benefit of the work done and the materials furnished and if it were a private person it would have been obliged to pay the value thereof to. plaintiff as a condition to the relief granted. Such an obligation does not rest on the United States because the fraud committed not only involved pecuniary loss to the United States, and the corruption of its public officials, but was in defiance of the laws of Congress and resulted in the defeat of the declared policy of Congress concerning the national safety. It is for Congress only to say whether or not this shall be forgiven and the wrongdoer shall be restored to the status quo ante.
In arriving at a conclusion, it is pertinent to consider, in addition to the wrong done the United States and the pecuniary benefits received by it, the following:
(a) $3,984,194.10 of the amount claimed, if recovered, is payable to Doheny.
(b) There is an outstanding judgment in favor of the United States against a company that at the time of the fraud was plaintiff’s wholly-owned subsidiary and was a party to the fraudulent transactions, but which no longer has any connection with plaintiff.
(c) That after'the final decision awarding judgment against plaintiff the old stockholders sold about three-fourths of their stock to a corporation not formerly interested in plaintiff, and that company will be the principal beneficiary of any sum awarded.
The foregoing findings of fact and opinion and conclusions will be certified to Congress in accordance with Senate Resolution 84 and section 151 of the Judicial Code. It is so ordered.
Madden, Judge; and Littleton, Judge, concur.
Jones, Judge; and Whaley, Chief Justice, took no part in the decision of this case.

Congressional Record, 77tU Congress, first session, pago 2116.

 March 4, 1913, c. 148, 37 Stat. 891, 898; June 30, 1914, c. 130, 38 Stat, 392, 401; March 3, 1915, c. 83, 38 Stat. 928, 937; August 29, 1916, c. 417, 39 Stat. 556, 570; March 4, 1917, c. 180, 39 Stat. 1168, 1179; June 15, 1917, c. 29, 40 Stat. 182, 207; July 1, 1918, c. 114, 40 Stat. 704, 726; November 4, 1918, c. 201, 40 Stat. 1020, 1034; July 11, 1919, c. 9, 41 Stat. 131, 145 ; June 5, 1920, c. 253, 41 Stat. 1015, 1030; July 12, 1921, c. 44, 42 Stat. 122, 130.